In re CONSOLIDATED PIONEER
MORTGAGE ENTITIES,
Debtor.

PIONEER LIQUIDATING
CORPORATION,
Plaintiff,

v.

SAN DIEGO TRUST & SAVINGS BANK;
First Interstate Bank of California, as
successor-in-interest by merger to San
Diego Trust & Savings Bank; and Wells
Fargo Bank, as successor-in-interest by
merger to First Interstate Bank of California, Defendants.

No. 94–361 SPK (BTM) (JFS).
Bankruptcy No. 91–00214–M11.

United States District Court,
S.D. California.

April 22, 1997.

Frederick McKnight, William Wilson, Scott Bertzyk, Jones, Day, Reavis & Pogue, Los Angeles, CA, for Plaintiff.

David Noonan, Steven Sanchez, Post, Kirby, Noonan & Sweat, San Diego, CA, for Defendants.

*AMENDED ORDER GRANTING DEFENDANT SAN DIEGO TRUST & SAVINGS BANK'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND DENYING PLAINTIFF PIONEER LIQUIDATING CORPORATION'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW*

SAMUEL P. KING, District Judge.

Plaintiff Pioneer Liquidating Corporation ("PLC") is a liquidating corporation, created in bankruptcy, and vested with substantially all the assets of the Consolidated Pioneer Mortgage Entities. The Consolidated Pioneer Mortgage Entities are a consolidation of the debtor estates of six related corporations that filed for bankruptcy in January 1991: Naiman Financial Corporation; Naimpro, Inc.; Naimco–Clairemont, Inc.; Naimco, Inc.; Alvarado Investment Corporation; and Frontier Service Corporation (collectively "debtors" or "Pioneer"). PLC was formed to take title to Pioneer's assets, liquidate the assets, and distribute them to creditors and investors according to a Joint Plan of Reorganization. PLC's assets include claims against third parties. This suit is an adversary proceeding against third-party defendant San Diego Trust & Savings Bank ("SDT" or "Bank") and its successor-by-merger, Wells Fargo Bank.

Pioneer was in the business of granting mortgages in the San Diego real estate market. Pioneer sold full and fractionalized trust deeds to investors in exchange for the funds required to make the underlying loans. Pioneer regularly made monthly payments to the investors as borrowers paid off the loans. One of Pioneer's practices was to give investors the option of receiving monthly advances even when an underlying loan was in default. Pioneer attracted new investor funds by promoting its "perfect payment record," claiming that "no investor had ever lost money" with Pioneer.

Pioneer's practice of making advances to investors required a constant large cash flow. Pioneer fell on hard times when the Southern California real estate market took a downturn in the late 1980s. Many of Pioneer's loans went into default, resulting in a shortage of incoming revenue. The shortage of revenue made it increasingly difficult to maintain the "perfect payment record." Pioneer continued to make advances to investors, but had to borrow money from several San Diego banks to stay in business.

At trial, PLC claimed that Pioneer ran out of borrowed money and had to resort to illegal Ponzi and check kiting schemes to raise revenue to pay its bills. PLC maintained that during the period leading up to bankruptcy, Pioneer misrepresented its financial condition to its investors, continued to make advances to investors on loans that

were in default, and continued to assure invest that their investments were secure. PLC maintained that the entire Pioneer operation became a Ponzi scheme; Pioneer used new investor funds to make advances to earlier investors while the company slid deeper and deeper into insolvency. PLC also alleged that in order to generate revenue, Pioneer engaged in a massive check kite between San Diego banks and between accounts at SDT. PLC further alleged that SDT was not only aware of the Ponzi and check kiting schemes, but actively facilitated Pioneer's fraudulent activities to keep the company in business so that Pioneer could pay down its line of credit with SDT. SDT denied that there was a check kite, denied that there was a Ponzi scheme, and denied that it knew of any fraudulent activity at Pioneer.

■ Although PLC and SDT disputed the definition and existence of a check kite, the parties agreed that SDT granted Pioneer "provisional credit" on all of the deposits that Pioneer made to various commercial accounts it maintained at the Bank. "Provisional credit" meant that when Pioneer deposited checks into its accounts at SDT, the Bank posted a credit to Pioneer's account and permitted Pioneer to withdraw the funds before the deposited checks cleared through the clearinghouse system.[1] SDT regularly granted provisional credit to all of its customers in good standing, as did many other smaller community banks in the San Diego area.

Undisputed evidence at trial established that Pioneer regularly wrote checks against its SDT accounts that lacked sufficient funds to cover the amount of the checks. The Bank regularly called Pioneer—almost on a daily basis—to say that it needed a deposit to "cover" the amount of the checks presented for payment the previous day. So long as a Pioneer representative brought in a "covering deposit," SDT paid the incoming checks. Pioneer always made a covering deposit, and, frequently, the checks deposited were drawn on other Pioneer accounts held at SDT or other San Diego banks. All the checks that Pioneer deposited into its accounts at SDT were eventually paid in the normal course of collection by the banks upon which they were drawn.[2] SDT eventually closed all of Pioneer's accounts over a period spanning the last four months of 1990. Pioneer filed for bankruptcy in January 1991.

PLC claimed that SDT's practice of allowing Pioneer to withdraw provisionally credited funds subjected it to liability in bankruptcy in excess of $71 million. PLC claimed that before the bankruptcy, Pioneer transferred more than $71 million to SDT that PLC is entitled to recover as preferences or fraudulent transfers under 11 U.S.C. §§ 544(b), 547(b), 548(a), and 550(a) of the Bankruptcy Code.

■ The parties filed cross-motions for summary judgment in early 1996. The court denied both motions, but ruled with respect to the recovery of preferences: "[t]he granting by a bank of provisional credit to a customer against uncollected funds represented by checks payable to the customer or the customer's order drawn on other banks creates an antecedent debt within the meaning of the Bankruptcy Code." Further, "[t]he bank granting the credit is the initial transferee of property of the depositor when it offsets that debt with after-collected funds." With respect to recovery of fraudulent transfers, PLC could recover "any transfer by a

---

1. As a general rule, a bank has the right to refuse to allow a depositor to make withdrawals against uncollected funds. *Discount Auto Mart, Inc. v. Bank of North Carolina*, 45 N.C.App. 543, 263 S.E.2d 41, 42 (1980). Banks typically allow customers to withdraw funds on provisional credit because the overwhelming majority of checks processed through the clearinghouse system are honored by the banks upon which they are drawn. U.C.C. § 4–210 comment (3). Because checks almost always clear, banks often give the customer use of deposited funds before they are required to do so. The undisputed evidence at trial established that every check that Pioneer deposited into SDT accounts was paid in the normal course of collection by the bank upon which it was drawn.

2. On 42 occasions during the relevant period, checks that Pioneer deposited as "covering deposits" were not honored by the payor banks. However, the undisputed evidence was that Pioneer re-deposited these "bounced" checks, and that these checks eventually cleared in the normal course of collection.

Pioneer Mortgage entity to San Diego Trust that was made with actual intent to hinder, delay, or defraud any past, existing, or future creditor of the transferor Pioneer Mortgage entity." The court noted the applicable reach-back period to be ninety days for preferences and four years for fraudulent transfers.[3]

PLC abandoned the preference claim before trial in order to simplify the case for the jury. The amount PLC sought to recover with a ninety day reach-back period under the preferences statute was miniscule compared to the $71 million it sought to recover as fraudulent transfers. PLC alleged that Pioneer fraudulently made 473 transfers to SDT during the 18 months leading up to bankruptcy, all of which were well within the four-year statutory reach-back period for fraudulent transfers.

■ The trial began in January 1997. SDT filed a motion for judgment as a matter of law at the close of PLC's case, which the court took under advisement. Both parties filed motions for judgment as a matter of law at the close of the Bank's case. The court took both motions under advisement. The court asked the jury to answer two questions on a special verdict form: (1) Did PLC prove by a preponderance of the evidence that there were one or more transfers of property, and the amounts thereof, to the Bank by any Pioneer Mortgage Debtor made with actual intent to hinder, delay, or defraud present or future creditors? If so, (2) did the Bank prove by a preponderance of the evidence that it acted in good faith with respect to any transfer or transfers you identified in response to question 1?[4] The jury deliberated at length, but could not reach a verdict, and the court declared a mistrial. Both parties filed renewed Rule 50 motions for judgment as a matter of law.

In view of certain uncontested evidence that was presented at trial, the court has decided to grant all of the Bank's Motions for

Judgment as a Matter of Law. The court has concluded that its April 3, 1996 order denying summary judgment was an incomplete statement of the relevant law. Insofar as the court's ruling was incomplete, it was also incorrect.

## I.  *Avoidable transfers of property*

■ To establish an "actual fraud" fraudulent transfer, the burden is on PLC to prove: (1) that a debtor transferred an interest in property to the Bank; (2) that the debtor transferred the property during the reach-back period; and (3) that the debtor made the transfer with actual intent to hinder, delay, or defraud a present or future creditor. 11 U.S.C. § 548(a); Cal. Civ.Code § 3439.04 (West Supp.1996). In comparison, to establish a preference, the burden is on PLC to prove: (1) that the debtor transferred an interest in property to or for the benefit of the Bank; (2) the transfer was for or on account of an antecedent debt existing before the transfer was made; (3) the debtor made the transfer while insolvent; (4) that the debtor transferred the property during the reach-back period; and (5) that the transfer caused the Bank to receive more than it would have otherwise received in a bankruptcy distribution. 11 U.S.C. § 547(b). The element common to a fraudulent transfer and a preference is the requirement that PLC prove a transfer of an interest in property. If PLC proves such transfer as well as the accompanying elements of either statute, then PLC may recover the property transferred for the benefit of the estate. 11 U.S.C. § 550(a).

Although the elements under each theory of recovery differ, the "transfers of an interest in property of the debtor" identified by PLC are the same for purposes of both statutes. PLC maintained throughout this case that the transfers it sought to recover met all of the requirements of both statutes, except

---

**3.** The reach-back period for fraudulent transfers under the federal statute is only one year. 11 U.S.C. § 548(a). However, the federal strong-arm statute makes transfers that are avoidable under state law avoidable in bankruptcy. 11 U.S.C. § 544(b). The reach-back period for fraudulent transfers under California state law is

four years. Cal. Civ.Code § 3439.04 (West Supp. 1996).

**4.** Good faith is a statutory defense. A good faith transferee who gives value may retain any interest transferred. 11 U.S.C. § 548(c).

that it could recover more of the transfers as fraudulent transfers because of the longer reach-back period; the transfers were preferences because Pioneer made them on account of an antecedent debt to SDT. PLC has also claimed that the transfers were fraudulent because they were made with intent to hinder, delay, or defraud creditors. Although the "actual fraud" fraudulent transfer statute does not require that a transfer be made on account of an antecedent debt to be subject to avoidance,[5] PLC maintained from the beginning that the fraudulent transfers were made to repay antecedent debts created by Pioneer's draws against provisional credit.

■■■■ PLC's theory is that provisional credit works like a short term loan: a bank that permits the customer to withdraw funds against provisional credit allows the customer to withdraw funds that the customer technically does not yet have a right to withdraw. When the customer withdraws the funds before a deposited check clears, the customer becomes indebted to the bank for purposes of bankruptcy because the customer has access to the bank's money while the checks go through the clearinghouse system. Repayment of the debt takes place, provisionally, when the bank receives the proceeds of the check, and finally, when the payor loses the right to return the check.[6] PLC contends that these repayments are "transfers" for purposes of the avoidance statutes. PLC argues that the transfers meet the requirements of a preference because Pioneer was insolvent at the time they were made, and the transfers put the Bank in a better position than it would have been in a bankruptcy distribution. The transfers are also recoverable as fraudulent conveyances, under PLC's

theory, because Pioneer's use of provisional credit was intended to hinder, delay, or defraud present or future creditors.

The transfers PLC seeks to recover took place notwithstanding that Pioneer did not have to take any subsequent action to "repay" the antecedent debt. The transfer occurred as a matter of law. Pioneer never even knew when it took place. Pioneer did not have to write a check to the Bank. The Bank did not have to notify Pioneer when the deposited checks became collected. The Bank just kept the proceeds of the checks in satisfaction of the debt that Pioneer had incurred by drawing against provisional credit.

■■■■ In the court's prior order denying summary judgment, the court ruled that Pioneer's use of provisional credit created an antecedent debt for purposes of the bankruptcy code. The court reasoned that when a customer deposits a check into its account, the customer remains the owner of the deposited check. The bank does not become the owner of the deposited check, even if the bank permits the customer to withdraw the funds before collection. Article 4 of the Uniform Commercial Code, the relevant portions of which have been adopted in California, explicitly states that the bank is the depositor's agent during check collection. Once the bank has collected the funds on behalf of its customer, the agent-principal relationship evolves into a debtor-creditor relationship. The bank becomes one of the customer's debtors if the customer does not draw on provisional credit; the bank becomes one of the customer's creditors if the customer did. In the latter case, the customer transfers the interest in the proceeds[7] of the collected

---

5. Indeed, there is no antecedent debt in the classic case of an "actual fraud" fraudulent transfer. The original fraudulent conveyance statute, in 13 Eliz. ch. 5 (1571), dealt with debtors who transferred property to their relatives, while the debtors themselves sought sanctuary from creditors. The family enjoyed the value of the assets, which the debtor might reclaim if his creditors stopped pursuing him. *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 892 (7th Cir.1988).

6. The check collection process becomes final when the payor bank makes "final payment" for

an item. U.C.C. § 4–215. An item is finally paid by a payor bank when the bank has first done any of the following: (1) Paid the item in cash; (2) Settled for the item without having a right to revoke the settlement under statute, clearinghouse rule, or agreement; or (3) Made a provisional settlement for an item and failed to revoke the settlement in the time and manner permitted by statute, clearing-house rule, or agreement. U.C.C. § 4–215(a).

7. Neither the customer nor the bank owns the check after check collection is complete; the bank relinquishes its rights to the check in ex-

check to the bank to the extent that it has already withdrawn the funds. The court's prior order concluded that the transfer of the customer's interest to the bank is subject to avoidance as a fraudulent transfer or as a preference.

## II. *Provisional Credit Under the U.C.C.*

▮ If PLC proves all of the elements of a preference or a fraudulent transfer, it is entitled to recover, for the benefit of the estate,[8] "the property transferred, or, if the court so orders, the value of the property transferred" to the Bank. 11 U.S.C. § 550(a). PLC's recovery is limited to the interest in property that Pioneer transferred to the Bank; PLC may not recover greater rights from the transferee than Pioneer had at the time of the transfer. It is therefore crucial to determine the nature and extent of the property interest that Pioneer retained in the proceeds of the deposited checks. The extent of that property interest is the extent of PLC's recovery.

The court's prior summary judgment order ruled that check collection results in the transfer of a property interest from the depositor to the bank; however, the court did not rule on the nature and extent of that property interest. Upon further consideration, the court is convinced that the property interest Pioneer transferred was an encumbered property interest, and that for all practical purposes, PLC's recovery is barred.

PLC sought to recover the full dollar value of the "repayments" to the Bank. In seeking to recover the full dollar amount, PLC assumed that Pioneer continued to hold a full unencumbered ownership interest in the deposited checks that it later transferred to SDT after collection. This assumption is incorrect.

▮ Under the U.C.C., the customer remains the owner of the checks during the

check clearing process. U.C.C. § 4–201 ("the collecting bank, with respect to the item, is an agent or subagent of the owner of the item . . . even though credit given for the item is subject to immediate withdrawal as of right or is in fact withdrawn"); U.C.C. § 4–201 comment (1) ("The customer of the depositary bank is normally the owner of the item and the several collecting banks are agents of the customer"). Although the customer remains the owner of the check, the customer's ownership interest becomes encumbered by a security interest in favor of the bank to the extent that the customer draws against uncollected deposited checks. U.C.C. § 4–210 ("A collecting bank has a security interest in an item and any accompanying documents or the proceeds . . . of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied"). If the customer only draws against a portion of the available provisional credit, the bank only has a security interest to the extent that the customer has withdrawn uncollected funds. *First Wisconsin National Bank v. Stiennon*, 73 B.R. 905, 908 (Bankr.W.D.Wis.1987) ("when a depositary bank advances funds to the payee, the depository bank obtains a security interest in the item (i.e., the check) to the extent of the advance"). In such instances the customer continues to have a full unencumbered ownership interest in the remainder of the value of the deposited check or checks. For example, suppose a customer has $100 in an account. The customer deposits a check for $500. The next day, before the deposited check has cleared at the payor bank, the customer withdraws $500. Because the customer already had $100 in the account, the bank has advanced the customer $400 in provisionally credited funds. The bank has acquired a $400 security interest in the customer's deposited check, as well as the proceeds of the check. The customer continues

---

change for payment. The bank receives "proceeds" when, in the process of check collection, it is credited for the amount of the check. *First Wisconsin National Bank v. Stiennon*, 73 B.R. 905, 908 (Bankr.W.D.Wis.1987). For purposes of section 4–210, proceeds are whatever the bank receives for the sale, exchange, collection, or disposal of the deposited check. *See id.* at 908.

**8.** The commencement of a bankruptcy case creates a bankruptcy estate. 11 U.S.C. § 541(a). The estate includes all legal or equitable interests of the debtor in property as of the commencement of the case, 11 U.S.C. § 541(a)(1), as well as interests in property that the trustee avoids as preferences or fraudulent transfers. 11 U.S.C. § 541(a)(3).

to hold a $100 unencumbered ownership interest in the check.

■ A security interest is an interest in property. *Schelle v. Mercantile Bancorporation, Inc.,* 741 S.W.2d 720, 727 (Mo.App. 1987). The separation of the "ownership" interest and the "security interest" in section 4–210 means that both parties have a property interest in the proceeds of the deposited check. Although both parties have a property interest in the check, section 4–210 operates to subordinate the depositor's ownership interest to the Bank's security interest. U.C.C. § 4–201 comment (5) ("If a collecting bank has made an advance on an item which is still outstanding, its right to obtain reimbursement for this advance should be superior to the rights of the owner to the proceeds or to the rights of a creditor of the owner"). Section 4–210 "operates to keep the risk of loss upon the owner of the item rather than the bank and gives the depositary bank a right to reimbursement *superior to the owner's rights to the proceeds* and superior to the rights of the owner's creditors." *Long Island National Bank v. Zawada,* 34 A.D.2d 1016, 312 N.Y.S.2d 947, 950 (1970) (emphasis added).

■ There are at least two ways to explain the operation of the Bank's security interest. The ordinary function of a security interest is to secure payment of an obligation. *See* U.C.C. § 1–201(37). This is consistent with PLC's theory that Pioneer's draws against provisional credit were really a series of "loans." If a customer's draw against provisional credit creates a "loan," then the "obligation" for which the security interest secures payment is the customer's obligation to repay the loan with the proceeds of the check. The check itself is the collateral and the bank is a fully secured creditor.

■ Under this construction of the operation of the security interest, PLC cannot recover from the Bank for two reasons: first,

payment to a fully secured creditor does not hinder, delay, or defraud creditors because it does not put assets otherwise available in a bankruptcy distribution out of their reach. *See Melamed v. Lake County National Bank,* 727 F.2d 1399, 1402 (6th Cir.1984). Second, the proceeds of the checks are not "an interest of the debtor in property." The court looks to state law to determine the extent of the debtor's property interests for purposes of avoidable transfers. *Kallen v. Ash, Anos, Freedman & Logan,* 790 F.2d 574, 575 (7th Cir.1986). The California fraudulent conveyance statute provides that property encumbered by a valid security interest is not subject to recovery under the state fraudulent conveyance statute. *See* Cal. Civ.Code §§ 3439.01 & 3439.04.

The problem with interpreting the operation of the security interest as security for payment of a loan is that such an interpretation does not comport with reality. Although there is a sense in which a draw against provisional credit may be thought of as a loan, the customer's obligation to the bank is not a loan in the ordinary sense of the word.[9] As the court has noted, the satisfaction of the customer's obligation ordinarily requires no action by the customer. The customer never even knows when "repayment" occurs. Further, the security interest that arises in favor of the Bank under section 4–210 is no ordinary security interest. The bank is not required to take any action to perfect the security interest, there is no formal procedure for foreclosing on the check, and, in the usual course of events, the security interest is self-liquidating. *See* U.C.C. § 4–210 comment (3).

In the real world, a bank's advances to the customer seem more like a transfer of ownership in the deposited checks and less like a loan. The bank expects that it will be entitled to keep the proceeds of the check when it finally collects the funds from the payor bank. Likewise, the customer recognizes that the bank is offering a service by allow-

---

9. After the court ruled on the cross-motions for summary judgment, but before the trial, the court received a letter from the Comptroller of the Currency urging the court to rule that draws against provisional credit do not create antecedent debt for purposes of the Bankruptcy Code.

The Comptroller expressed concern about the effects of such a ruling on the banking industry, and emphasized that advances to a depositor paid against uncollected funds are not considered to be loans for regulatory purposes. *See* 12 C.F.R. § 32.2(j)(2).

ing withdrawal before collection, and expects that the bank will keep the proceeds of the deposited checks.

Although both parties understand that the customer somehow surrenders its interest in the check in exchange for the privilege of withdrawing funds, the U.C.C. expressly provides that the depositor remains the owner of the check while the check passes through the clearinghouse system. While this court will not judicially overwrite the U.C.C., harmonizing this ownership provision with banking reality and fraudulent transfer law is like forcing a square peg into a round hole. To reconcile these areas, an alternate, and what this court finds to be a better explanation of the operation of the bank's security interest is that the division of interests in the deposited check is a division of legal and equitable interests. The customer's ownership interest is a legal interest in the check, and the Bank's security interest is an equitable interest in the proceeds of the check.[10] *Cf. In re Green,* 64 B.R. 462, 465 (Bankr.S.D.Ind.1986) (in jurisdiction following the lien theory of mortgages, "to the extent property is subject to a perfected security interest, the monetary value of such security interest is an equitable interest"); *In re Temp–Way Corp.,* 80 B.R. 699 (Bankr. E.D.Pa.1987) (extent of debtor's interest in a joint check to which it had no right to payment, but was a named payee, was limited to "bare legal title").

The interest in property that Pioneer retained in the checks, and that was later transferred to SDT, was equivalent to "bare legal title". When the Bank's equitable interest in proceeds (obtained by advancing funds to Pioneer) merged with legal title to the proceeds (which Pioneer transferred to SDT as a matter of law upon completion of check collection), the Bank's security interest "liquidated" and the Bank became the outright owner of the proceeds. *See* U.C.C. § 4–210 comment (3). Because the interest that was transferred to the Bank when the Bank received the proceeds of the deposited checks was not an equitable interest, PLC cannot recover the value of the Bank's equitable interest in an avoidance action. Therefore, if Pioneer is entitled to recover anything, its recovery would be limited to the value of bare legal title. *Cf. In re Central States Press,* 57 B.R. 418 (Bankr.W.D.Mo. 1985) (extent of recovery under § 547 or § 548 is the difference between the value of the property transferred and the value of the security interest).

Under either rationale of how the security interest works, the result is the same: PLC cannot recover because the Bank had a property interest in the proceeds of the deposited checks superior to Pioneer's. The value of the Bank's superior property interest is equal to the proceeds the Bank eventually collected on Pioneer's behalf. Even if Pioneer could recover the property interest it retained in the proceeds, the cash value of that property interest is zero. For all practical purposes, PLC cannot recover from the Bank.

## III. *Validity of the Security Interest*

To avoid the effect of the Bank's security interest, PLC contends that the validity of the security interest is somehow dependent on the Bank's good faith defense. PLC has not cited any cases that support the proposition that the failure to establish a bankruptcy section 548(c) good faith defense defeats a U.C.C. § 4–210 security interest. The court is not aware of any cases that have held that a section 4–210 security interest is subject to a good faith requirement. PLC cites cases that have held that there is a statutory good faith requirement for a depositary bank to have holder in due course status under section 3–302 of the U.C.C. However, holder in due course status has no relevance to the validity of a section 4–210 security interest. *See Key Bank of Southeastern New York v. Strober Bros. Inc.,* 136 A.D.2d 604, 523 N.Y.S.2d 855 (1988). A bank's rights as a holder in due course relate to its right to enforce an instrument against

---

10. This assumes that the customer has withdrawn the entire amount of the check—such that the Bank has a security interest equal to the entire amount of the check. If the customer has not withdrawn all of the provisionally credited funds, then the bank would only own a equitable interest in part of the check.

the maker of the check. *See* U.C.C. § 3–302. A bank's rights as a secured party under section 4–210 relate to its rights against its depositor and its depositor's creditors. *Long Island National Bank v. Zawada*, 34 A.D.2d 1016, 312 N.Y.S.2d 947, 950 (1970).

■ There are significant reasons why the validity of a section 4–210 security interest should not depend on a successful section 548(c) good faith defense. First, the defendant has the burden of proving good faith at trial—not the party seeking to overcome the effect of the security interest. Second, the relevant "fraudulent intent" in a fraudulent transfer action is the transferor's fraudulent intent—not the defendant transferee's. A transferee's failure to establish good faith does not mean that the transferee engaged in any wrongful conduct. It only means that the transferee possessed enough knowledge of the facts to induce a reasonable person to inquire further about the transaction. *See In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, 535–36 (9th Cir. 1990) (federal law); *In re Cohen*, 199 B.R. 709, 719 (9th Cir. BAP 1996) (California fraudulent conveyance statute).

A bank may be held liable for its own wrongful conduct under several common law or statutory theories of recovery, but such theories should not be confused with fraudulent transfer liability. The purposes and policies of fraudulent transfer liability, together with the elements and burdens of proof, are different from those in tort. The investors who lost money when Pioneer collapsed have already sued the Bank for its alleged wrongful management of the Pioneer accounts at SDT. The Pioneer investors filed individual suits in San Diego County Superior Court against numerous San Diego banks, including SDT, alleging common law tort theories and violations of the California Corporations Code. One of these suits went to trial as a "test case;" the jury returned a verdict in favor of SDT after a four month trial. The remaining investor plaintiffs settled with the Bank. The Pioneer investors also filed a class action in this court against many of the same defendants, including SDT, alleging vi-

olations of the federal RICO statute and other statutory and common law theories. The investors and SDT agreed to a settlement in the class action as well. PLC sought additional common law relief against SDT in this suit, but the court dismissed the tort cause of action at the summary judgment stage.

## IV. *The Security Interest as a Fraudulent Transfer*

PLC also seeks to avoid the effect of the Bank's security interest by arguing that it can recover the Bank's equitable interest in the checks as a fraudulent transfer. PLC is wrong for a number of reasons.

■ First, the creation of the Bank's section 4–210 security interest in the checks is not a transfer for purposes of the Bankruptcy Code.[11] The Bankruptcy Code defines "transfer" broadly to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(54). Notwithstanding this broad definition, it is well settled that a customer's bank deposits into its own unrestricted checking account are not transfers within the meaning of the Bankruptcy Code. *New York County Nat. Bank v. Massey*, 192 U.S. 138, 145, 24 S.Ct. 199, 200–201, 48 L.Ed. 380 (1904); *In re Applied Logic Corporation*, 576 F.2d 952, 962 (2d Cir.1978). When the customer makes a deposit, the bank substitutes a credit for the deposited currency, bank notes, checks, drafts, and other bankable items. *Citizens' National Bank of Gastonia v. Lineberger*, 45 F.2d 522, 527 (4th Cir.1930). The substitution differs from a transfer because the customer continues to have the right to withdraw the deposited funds. *Id.* Because the depositor has the right to withdraw the deposited funds, the deposit does not deplete the depositor's estate. *Id.* Although the customer "disposes of" or "parts with" the deposited items in exchange for the

---

11. PLC has not cited, and the court's research has not found, a single case in which a court held a § 4–210 security interest to be the subject of fraudulent transfer liability.

credit, this "parting" is not a transfer for bankruptcy purposes because, in effect, the assets available to the customer have not changed.

■ For similar reasons, the U.C.C. security interest in deposited checks that arises in favor of the bank when the customer withdraws provisionally credited funds is not a transfer. The security interest does not deplete the depositor's estate or change the assets otherwise available to creditors. The security interest does not impede the customer's control over how to spend the deposited funds. The security interest is a "temporal interest" [12] that does not burden the customer. On the contrary, the security interest operates as a benefit to the customer, rather than a burden, because it enables the customer to enjoy immediate access to the deposited funds. Creation of the security interest is what enables the customer to withdraw the "substituted" funds the bank credited to the customer's account when the customer made the deposit.[13] The security interest is not a "parting" with property because the customer gets access to substituted funds in exchange. Because the creation of the security interest does not require the customer to surrender an interest that it could otherwise retain, the creation of the security interest is not a transfer.

■ Second, even if the creation of the Bank's security interests amounted to "transfers" of an interest in property to SDT, such "transfers" lack a sufficient nexus with Pioneer's fraudulent intent to be avoidable under 11 U.S.C. § 548(a). PLC must prove that Pioneer made the transfer it seeks to recover with the intent to hinder, delay, or defraud creditors. 11 U.S.C. § 548(a). Pioneer's intent with respect to the creation of the bank's security interest was to obtain access to deposited funds; the creation of the security interest was incidental to the with-

drawals against provisional credit. There is nothing fraudulent or illegal about the use of provisional credit. The effect of the draws against provisional credit on Pioneer's creditors was to shorten the time that existing creditors had to wait to get paid.

PLC argues that there is a sufficient nexus between Pioneer's use of provisional credit and its fraudulent intent; PLC claims that Pioneer utilized the Bank's extensions of provisional credit to perpetrate a "massive check kite." At trial, there were substantial disagreements between the parties on the definition of kiting and the proper method for calculating the magnitude of a kite. PLC and SDT agreed that a kite is a fraudulent scheme wherein a bank customer utilizes the time that it takes for checks to clear to create artificially high balances of nonexistent funds through a systematic exchange of checks between accounts. PLC's experts testified that the definition of kiting is broad enough to include checking transactions between accounts at the same bank. PLC's experts also claimed that it is possible for a bank to intentionally facilitate a check kite. SDT's experts insisted that a kite is, by definition, a fraud against banks that exposes banks to extensive liability; consequentially, kiting requires an exchange of checks between at least two banks, both of which are unaware of the kite until it is inevitable that one of the banks will lose money. The kite crashes when one of the banks discontinues the policy of allowing the customer to withdraw funds against provisional credit. The bank that suspects a customer is kiting puts a "hold" on deposited checks and bounces checks presented for payment against the customer's account. The bank that was expecting to receive the proceeds of the bounced check gets left "holding the bag."

The significance of the difference in the definitions comes into play when the parties

12. The payor banks honored all of the checks that Pioneer deposited, and the Bank received the proceeds for all of the deposited checks. All of the security interests were self-liquidating. There is no cognizable interest in property left for PLC to recover.

13. The purpose of the security interest is to grant some limited protection to the bank when the

bank provides a service to its customer that it is not required to provide. As PLC concedes, the customer is in a much better position as a result of the security interest than the bank because the customer receives cash in exchange for an uncollected check. The security interest is a liability for the bank because of the possibility that the payor banks will not honor the deposited checks.

apply their respective definitions to what the undisputed facts show to be a common scenario during the relevant period: Checks came in against one of Pioneer's accounts (account "A"). Because Pioneer did not have sufficient funds in account "A" to pay the checks, the checks appeared on SDT's posting reject journal. The Bank called Pioneer to say that it needed a covering deposit. Pioneer brought in a covering deposit, and SDT paid the checks. The problem is that the check that Pioneer deposited to cover account "A" is drawn on another Pioneer account (account "B") that did not have sufficient funds.

That amounts to check kiting by PLC's definition. PLC insists that the check drawn on account "B" is a worthless kited check. According to SDT, this series of transactions alone does not amount to check kiting, and the check drawn on account "B" is not a worthless check. SDT emphasizes a number of other undisputed facts: Pioneer had numerous accounts at SDT. State regulations required Pioneer to transfer certain funds through a series of different accounts. Although accounts represented by account "B" in the illustration might have had insufficient funds on a particular day, Pioneer had enough money in other accounts (accounts "C, D, and E") to cover the check drawn on account "B".[14] The undisputed evidence was that on all but six days during the relevant period—all after September 10, 1990—Pioneer had enough money in the aggregate in all of its accounts to cover all of the checks that it wrote between accounts. SDT argues that in light of this undisputed evidence, there was no check kiting.

The court recognizes that different experts might use the term "check kiting" in different contexts to mean different things. It is not necessary for the court to decide the "proper definition" of kiting. It is sufficient for the court to note that the transactions that PLC's experts refer to as a "check kite" do not bear a sufficient nexus between a section 4–210 security interest and intent to hinder, delay, or defraud creditors to make the "transfers" of the security interests "fraudulent transfers." The only "check kite" that could provide a sufficient nexus to Pioneer's fraudulent intent is one ultimately intended to defraud a bank. This is the only type of check kite that would have any bearing on the effect of the security interest because it would be designed to leave one bank "holding the bag" with a worthless check. The undisputed evidence was that there was no such intent in this case. Pioneer's use of provisional credit did not cause any bank to lose money, nor was it calculated to do so. The undisputed evidence at trial showed that Pioneer fully expected all of its deposited checks to be honored by the payor banks, and that, in fact, all of the checks were so honored. No kite ever crashed, and no bank lost money as a result of the series of checking transactions that PLC refers to as a "massive check kite." Pioneer may have intended to defraud its creditors, but the "transfer" of a security interest in deposited checks—which arises in favor of the bank as a matter of law—is too far removed from any fraud to create fraudulent transfer liability.

Third, even if the creation of the section 4–210 security interest were a "transfer" bearing a sufficient nexus to Pioneer's fraudulent intent, PLC may not recover the aggregate dollar value of the Bank's temporal security interests. PLC calculated the $71 million total it seeks to recover by adding the daily amounts of the Bank's advances to Pioneer, to the extent that the Bank exposed itself to a potential loss, during the eighteen month period leading up to bankruptcy.[15]

**14.** PLC argues that the bank did not always have a right to take money from one account to cover checks in other accounts. Specifically, PLC contends that the bank did not have the right to take funds from the client trust account, but that 80% of the transfers between accounts involved the transfer of client trust funds. This may be true, but the Bank never made any transfers without Pioneer's consent. The Bank always called to inform Pioneer which accounts needed covering deposits, and Pioneer representatives always authorized the transfer of funds between accounts.

**15.** PLC presented evidence at trial that Pioneer was withdrawing funds against provisional credit as early as 1984. The California fraudulent conveyance statute permits PLC to recover fraudulent transfers made four years prior to the filing of the bankruptcy, which would mean that PLC could recover fraudulent transfers made between January 1987 and January 1991. PLC seeks to

These hypothetical transfers, however, did not deplete the debtor's estate by the aggregate amount of each day of the Bank's provisional credit exposure. PLC may not recover the aggregate total because the Bank's extension of provisional credit simply did not increase the assets otherwise available to creditors by $71 million.

PLC argues that "depletion of the estate" is not an element of proof in the fraudulent transfer statute. Although there is no formal "diminution of estate" requirement in the statutory language, the purpose of fraudulent transfer recovery is to prevent a debtor from putting assets otherwise available to its creditors out of their reach: "In our quest to understand fraudulent transfer liability, we often overlook first principles. At its core, fraudulent transfer law is a debt-collection device and not a revenue generating tool; its mission is to prevent the unjust diminution of the debtor's estate." Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr.Dev. J. 55, 128 (1991). *Cf. In re Acequia*, 34 F.3d 800, 812 (9th Cir.1994) (requiring the transferee to disgorge wrongfully-transferred funds will "make the bankruptcy estate whole").

The "diminution of estate" or "depletion of the estate" concept usually arises in connection with preferences. Daniel R. Cowans, *Bankruptcy Law and Practice* § 10.9(b) at 349 (6th ed.1994), but courts have applied the doctrine to fraudulent transfers as well. *See, e.g., Melamed v. Lake County Nat. Bank*, 727 F.2d 1399 (6th Cir.1984). The purpose of fraudulent transfer law is to protect creditors from last-minute diminutions of the pool of assets in which they have interests. *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 892 (7th Cir.1988). *See also* Daniel R. Cowans, *Bankruptcy Law and Practice* § 10.9(b) at 349 (6th ed. 1994) ("The purpose of the fraudulent conveyance remedy is to negate transactions which decreased the debtor's ability to pay his creditors").

A diminution of estate issue rarely arises in the context of fraudulent transfers because there is usually no question that the fraudulent transfer depleted the estate of the debtor in the amount of the transfer. *See, e.g., In re Acequia*, 34 F.3d 800, 806–07 n. 2 (9th Cir.1994). ordinarily, the total amount of the property fraudulently transferred would otherwise be available to creditors. Under the unique facts and theory of this case, however, the purported fraudulent transfers of security interests did not impede Pioneer's ability to pay its creditors by an aggregate total of $71 million; the "transfers" did not deplete the estate at all. Even if the court bypassed the Bank's security interest in the deposited checks—or ruled that the security interests were void—the aggregate dollar amounts of Pioneer's draws against provisional credit are not the measure of the depletion of the estate because the Bank did not grant $71 million to Pioneer in provisional credit all at once. The grants of provisional credit were sequentially dependent; each grant of provisional credit was wholly dependent on satisfaction of the prior extension of provisional credit. There was never a time when Pioneer had access to $71 million in borrowed money that would have otherwise been available to creditors. At most, the "transfers" depleted the estate by $3.3 million, the amount that PLC claims the Bank advanced to Pioneer against provisional credit on February 20, 1990. This amount represents the Bank's greatest single-day exposure during the relevant eighteen month period.

Although PLC's primary argument is that there is no depletion of the estate requirement for fraudulent transfers, PLC argues in the alternative that there was a diminution of the estate in this case because the Bank's policy of extending provisional credit helped Pioneer stay in business while it sank deeper and deeper into insolvency. PLC claims that Pioneer could not have survived during the eighteen months leading up to bankruptcy if SDT had stopped permitting withdrawals against provisional credit. PLC claims that

---

recover only those "transfers" occurring in the eighteen months leading up to bankruptcy, from July 1989 to January 1991. PLC does not seek to recover any transfers that took place from January 1987 to July 1989. The court can only speculate as to the figure PLC would be seeking to recover if it aggregated all of the "transfers" arising out of provisional credit that Pioneer made during the four years leading up to bankruptcy.

Pioneer attracted more than $50 million in new investor funds during the final eighteen months. PLC also claims that notwithstanding the influx of new investor funds, the net worth of Pioneer declined $41 million during this period.

PLC's analysis is flawed because it fails to distinguish between the effect of the transfers on the size of the bankruptcy estate, which is the measure of recovery for a fraudulent transfer, and the long term effect of the Bank's policy of extending provisional credit, which might be the proper measure of recovery in tort. The amount of money that investors lost in Pioneer does not measure the depletion of the estate. Nor does the decline in the net worth of Pioneer. The proper measure of depletion of the estate is the amount of property that would otherwise be available to creditors "but for" the transfers. As the court has explained, the transfers in this case were sequentially dependent. But for the first one, two, or three transfers that PLC seeks to recover, the remaining 470 transfers would have never taken place. PLC has not met its burden of proving depletion of the estate by showing that the transfers enabled Pioneer to stay in business, and that as a result of staying in business, Pioneer was able to defraud investors out of $50 million that—but for the transfers— would have never been invested.

■ The "transfers" that PLC seeks to aggregate are not what the Bankruptcy Code was designed to bring back into the debtor's estate. To permit PLC to recover the aggregate total of all of Pioneer's withdrawals of provisional credit would, in effect, turn the fraudulent transfer statute into a revenue-generating device.[16]

## V. Conclusion

In sum, PLC is not entitled to recover— either as preferences or as fraudulent transfers—the amount of the advances, drawn against provisionally credited deposits, that SDT extended to Pioneer. PLC is barred by the Bank's U.C.C. § 4–210 security interest. The validity of the security interest in bankruptcy does not depend on proof of the good faith defense under § 548(c) of the Bankruptcy Code. PLC may not recover the security interests because the creation of a section 4–210 security interest is not a transfer for bankruptcy purposes. Had the creation of the security interest met the requirements of a transfer for bankruptcy purposes, PLC still would not be able to recover the value of the security interests because (1) creation of the security interest does not bear a sufficient nexus with any fraudulent intent of Pioneer, and (2) creation of the security interests did not deplete the pool of assets otherwise available to creditors by the aggregate total of the advances.

Therefore, the court GRANTS: (1) SDT's Motion for Judgment as a Matter of Law After the Close of Plaintiff's Case-in Chief; (2) SDT's Motion for Judgment as a Matter of Law After Close of All Evidence; and (3) SDT's Motion for Judgment as a Matter of Law After Mistrial and DENIES: (1) PLC's Amended Motion for Judgment as a Matter

---

**16.** The Ninth Circuit condemned a similar attempt to use the bankruptcy statutes to obtain a double recovery in *In re IRFM, Inc.*, 52 F.3d 228, 232 (9th Cir.1995), but the holding of that case was limited to the preference statute. A specific provision in the preference statute gives protection to a creditor who gives new value after the transfer. *See* 11 U.S.C. § 547(c)(4). The rule's effect is that the trustee may not recover the aggregate total of all payments on running accounts when the creditor continues to extend credit to the debtor on the condition that the debtor pay down its balances. Without the protection of the rule, a creditor would lose (1) all payments during the reach-back period as well as (2) all the new value that it extended to the debtor. *See IRFM*, 52 F.3d at 232. *See also In re Stewart*, 233 F.Supp. 89 (D.Or.1964) (application of the judicially-created "net-result" rule

under the old bankruptcy act). The *Stewart* court emphasized the rationale for protecting a creditor that continues to extend fresh credit:

> Anyone, who has had even the slightest contact with the business world, knows that such an arrangement is not unusual and that such a plan as that, time after time, assists the debtor in putting his house in order, paying all creditors and making a success of his own venture. To treat such a transaction as a preference within the meaning of the bankruptcy act would be nothing short of placing a premium, or a brand of approval, on the actions of those creditors who do not attempt to assist the debtor, but on the other hand attach the property and thus force the debtor out of business.

*Stewart*, 233 F.Supp. at 92. *See also In re Columbia Packing Co.*, 44 B.R. 613, 614 (Bankr. D.Mass.1984).

of Law;  and (2) PLC's Renewed Motion for Judgment as a Matter of Law.

IT IS SO ORDERED.