In re Bill L. WALTERS, Debtor.

Richard A. MARSHACK, as Chapter 7 Trustee of the Estate of Bill L. Walters, Plaintiff,

v.

WELLS FARGO BANK as Trustee under trust dated November 10, 1977, aka Getty Trust, aka Nisa Trust; and Does 1 through 100, inclusive, Defendants.

Bankruptcy No. SA90–07833 JW.
Adv. No. SA92–02109.

United States Bankruptcy Court,
C.D. California.

Jan. 11, 1994.

Joel S. Miliband, Laurel R. Zaeske and Steven Kraemer of Rus, Miliband, Williams & Smith, Irvine, CA, for plaintiff Richard A. Marshack, Chapter 7 Trustee.

Curt Todd and James P. Gregory of Haligman & Lottner, Englewood, CO, and Robert A. Fisher, Law Offices of Robert A. Fisher, Irvine, CA, for defendants Wells Fargo Bank and Nisa Trust.

## MEMORANDUM OF DECISION

JOHN J. WILSON, Bankruptcy Judge.

### I. INTRODUCTION

Chapter 7 Trustee Richard A. Marshack ("Trustee") filed an action to avoid and recover preferential transfers totalling approximately $135,000.00 made by BILL L. WAL-

TERS ("Debtor") to WELLS FARGO BANK as Trustee under the Trust dated November 10, 1977, aka GETTY TRUST, aka NISA TRUST ("Defendants"). Trustee contends that each of these transfers constitute voidable preferential transfers made for the benefit of WALTERS INVESTMENTS ("WI"), an insider of the Debtor. The Trustee also seeks to avoid and recover as fraudulent transfers, the payments to the Defendants by Debtor under a Guaranty, relying on §§ 548(a)(2) and 544 of the Bankruptcy Code, and §§ 3439.04(b) and 3439.07 of the California Civil Code.

### II. STATEMENT OF FACTS

The Debtor was an architect and a real estate developer in the Denver Metropolitan area. Debtor transacted business through a number of different entities including Bill L. Walters Investment Properties, Ltd. ("BWIP"), a Colorado Limited Partnership of which the Debtor was a general partner, Walters Investments, Ltd. ("WI"), a Colorado Limited Partnership of which BWIP was a general partner, and 17th and Market Associates, Ltd. ("SMA"), a Colorado Limited Partnership of which WI was a general partner.

On or about July 12, 1984, SMA sold certain real property to Defendants. The real property was improved with an office building which contained approximately 208,564 rentable square feet of commercial office space and an adjacent parking structure for approximately 715 vehicles ("the Property").

Pursuant to the terms of the written purchase and sale agreement (the "Purchase Agreement"), SMA guaranteed that Defendants would receive a minimum amount of net cash flow from the Property. The Purchase Agreement provided that in the event the net cash flow[1] fell below the minimum guarantee, SMA was obligated to pay to Defendants the cash shortfall. As of approximately December 31, 1989, the unpaid amount owing to Defendants for the accumulated cash shortfall was approximately $1,154,000.

---

1. Under the terms of the Purchase Agreement, net cash flow was defined as cash income from the Property less cash expenditures related to the Property.

In 1988, SMA was dissolved and WI, as the general partner of SMA, assumed all assets and liabilities of SMA, including the obligation to pay the cash shortfall. During 1989 and early 1990, WI attempted to restructure the debt owed to Defendants in order to cure the arrearage occurring under the terms of the Purchase Agreement. However, WI was unable to meet its financial commitments and was dissolved on or about October 13, 1990.

At all times relevant herein, Debtor was the sole general partner of WI. WI had little or no business activity, notwithstanding its obligations under the Purchase Agreement entered into with Defendants. Trustee contends WI was a creditor of Debtor in that under the terms of the WI Limited Partnership Agreement and Colorado law, Debtor was personally liable to WI for its partnership negative capital account. During the one year prior to the bankruptcy, Debtor made payments to Defendants for the cash shortfall totalling approximately $135,000.00.

After the transaction, the Defendants operated the Property at a Deficit cash flow for several years. In the period between 90 days and one year before the date of Debtors' bankruptcy filing on November 2, 1990, the Debtor made eight (8) payments to Defendants totalling approximately $135,000.00, on account of his Guaranty.

Debtors' statements and schedules do not list any obligation owing from Debtor to either WI or SMA. However, the statements and schedules do show that WI was dissolved in October, 1990, when Debtors' interest in WI was transferred to International Athletic Clubs of America, Inc. ("IAC") for "tax balancing" purposes. At this time, it appears unlikely that general unsecured creditors will receive more than a nominal distribution.

The Trustee seeks to avoid and recover the payments from the Defendants as preferential transfers pursuant to the reasoning set forth in *Levit v. Ingersoll Rand Corp., et al.,* 874 F.2d 1186 (7th Cir.1989). The Trustee contends that WI and SMA were insider creditors of Debtor on the basis of Debtor's alleged negative capital account in WI, and on the basis of WI's alleged negative capital account in SMA. The Trustee also seeks to

avoid and recover the payments to the Defendants by Debtor under the Guaranty as fraudulent transfers, relying on §§ 548(a)(2) and 544 of the Bankruptcy Code, and §§ 3439.04(b) and 3439.07 of the California Civil Code. After a hearing on the Trustee's and Defendant's cross-motions for summary judgment the Court took this matter under submission to determine whether the Trustee could avoid and recover the transfers pursuant to Bankruptcy Code §§ 547, 548(a)(2), 544 and 550.

### III. DISCUSSION

#### 1. Standard and Burden of Proof Under Bankruptcy Code § 547

The Trustee seeks to recover $135,000.00 from the Defendants under the rationale first set forth in *Levit v. Ingersoll Rand Financial Corp., et al.,* 874 F.2d 1186 (7th Cir.1989) ("*Deprizio*"). The *Deprizio* analysis begins with Bankruptcy Code § 547(b) which defines those transfers which are avoidable. *In re Sufolla,* 2 F.3d 977, 980 (9th Cir.1993), *citing Deprizio,* 874 F.2d at 1194. The Trustee has the burden of proving by a preponderance of the evidence each element of a preferential transfer. *In re R & T Roofing Structures & Commercial Framing, Inc.,* 887 F.2d 981, 988 (9th Cir.1989); *In re Bullion Reserve of North America,* 836 F.2d 1214, 1217 (9th Cir.1988), *cert. den.,* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988) (citation omitted). The Trustee must also prove that the property involved was property of the debtor such that the transfer diminishes the fund from which bankruptcy creditors may be paid. *In re California Trade Technical Schools, Inc.,* 923 F.2d 641, 645 (9th Cir.1991).

#### 2. Elements of a Preferential Transfer

Bankruptcy Code § 547 provides as follows:

"..., the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

\* \* \* \* \* \*

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title."

11 U.S.C. § 547 (1988).

During the period October, 1989 through May, 1990, the Debtor made 8 separate payments to Defendants totaling approximately $135,000. Trustee contends the following: the payments were made for the benefit of WI, an insider to the Debtor; the payments were made for or on account of an antecedent debt owed by the Debtor arising from the negative capital accounts of WI which the Debtor, as a general partner of WI, was obligated to pay; and, such payments were made while the Debtor was insolvent and enabled both WI and Defendants to receive more than such creditors would receive in a Chapter 7 case.

## A. Transfers of Property Made to or For the Benefit of a Creditor of the Debtor

 Debtor tendered and Defendants have acknowledged receipt of the payments. Given the Bankruptcy Code's broad definition of transfer, there is no dispute that the Payments constituted a transfer of property of the Debtor to Defendants for the benefit of the alleged insider WI.

Claim is defined broadly as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A) (1988).

In this case, WI simply had no "right to payment" until (1) **after** the distributions were made, **and only if** (2) Debtor **then** had a deficit balance in his capital account. The only time during the applicable one year period when the foregoing occurred was in October, 1990 in the course of the Tax Balancing Transaction with IAC. At that time, the Trustee's own evidence shows that Debtors' capital account in WI was zero.

Moreover, Debtor had a $1,079,127 negative capital account balance at the beginning of the year; however, it also shows that Debtor made $2,721,146 in capital contributions during the year. The Trustee cannot say when the contributions were made. Even if a negative capital account can be the debt owed to an insider for the purposes of avoiding a trilateral preference, and even if Debtor had a negative capital account balance in either or both WI and SMA at the beginning of 1990, then the Trustee still must prove that such negative capital account balance(s) existed on the date of each payment. However, the Trustee has not provided any such evidence.

The negative capital account was never a "real debt." The Trustee acknowledges that whatever negative capital account balance Debtor had in WI was wiped out in the October, 1990 Tax Balancing Transaction, when IAC assumed all existing obligations. The Defendants did not receive payment in full through the Tax Balancing Transaction, nor did the payments they did receive have anything whatsoever to do with that transaction. The Tax Balancing Transaction was an accounting transaction for tax purposes, just as a capital account is a means of keeping track of a partner's interest in the partnership from an accounting or tax perspective—neither has anything to do with bona fide "debt," or a bona fide "right to payment."

The Trustee repeatedly cites only part of the pertinent language in the Third Amendment to Partnership Agreement of WI which it contends establishes the "debt" upon which the alleged debtor/creditor relationship between Debtor and WI is be based. The entire section is as follows:

"6.5. Distributions in Liquidation

"(a) Priority of Distributions. All distributions of Liquidation Proceeds to Part-

ners and Transferees shall be made after the allocation among the Partners and Transferees pursuant to Article 7 of Partnership profits or losses for the Partnership for which the liquidation occurs (including any gain or loss deemed to have been realized as the result of a distribution in kind, pursuant to Section 6.6), and shall be made in accordance with the balances remaining in the Partners' and Transferees' capital accounts.

"(b) *Negative Capital Account Payback.* If, after making the distributions provided for in subsection 6.5(a), any Partner or Transferee has a deficit capital account balance, then each such Partner or Transferee shall be required to make a contribution to the capital of the Partnership in an amount equal to the lesser of:

"(i) The amount of the deficit balance in such Partner's or Transferee's capital account; or

"(ii) Such Partner's or Transferee's share (determined pro rata in proportion to the deficit balances in the capital accounts of all Partners and Transferees having deficit capital account balances at that time) of the sum of the amount required to satisfy any recourse liabilities of the Partnership plus the sum of the positive capital account balances of all Partners and Transferees having positive capital account balances at that time.

"All amounts contributed to the Partnership under this subsection 6.5(b) shall then be applied and distributed as provided in subsections 12.2 and 6.5(a)."

This determination can only be made—if at all—in the context of the dissolution and liquidation of WI [hence the title, *"Distributions in Liquidation"*], and it is only relevant in the liquidation context. It is at that time, and after an allocation of Partnership profits and losses, that the positive capital account balances of the other partners exceeding amounts due recourse third party creditors would be determined. Under that clear language, a partner is obligated to contribute capital only to the extent that there exists at the time of liquidation partners with positive capital account balances and/or outstanding recourse obligations due third party

creditors of WI. The only time during the applicable one year period when the foregoing occurred was in October, 1990 in the course of the liquidation of WI pursuant to the Tax Balancing Transaction with IAC. At that time, Debtor's capital account in WI was zero; prior to that time—and during the time when the payments were made—Debtor's capital account was irrelevant, because WI simply had no right to payment until WI was liquidated, and then only after the allocation of Partnership profits and losses, and then only if the other partners had positive capital account balances and there existed outstanding partnership recourse obligations due third party creditors.

The Trustee has failed to prove that Debtors' payments to the Defendants conferred a benefit upon WI. The Trustee attempts to establish a benefit by the bald assertion that, "Each payment by the Debtor to the Defendants reduced in like amount the debt of the Debtor to WI for his antecedent negative capital account." Under the Third Amendment to the Limited Partnership Agreement of WI, no payment was due WI by Debtor at the time Debtor made any of the payments to the Defendants. Furthermore, the Trustee's conclusory assertions without any support cannot sustain the Trustee's burden of quantifying the benefit enjoyed by the insider. *See, Sufolla,* 2 F.3d at 984–85. Debtor's payments were on account of his own direct, primary liability under the Guaranty, not on account of any alleged negative capital account balance. That is especially true when Debtor made over $2,000,000.00 in capital contributions during the same year, which far exceeded his negative capital account balance in WI at the beginning of 1990.

■ In this Circuit, the benefit to the insider creditor must be "quantifiable." *Sufolla,* 2 F.3d at 984–985. The Trustee, however, fails to quantify the benefit, if any, received by WI from Debtor's payments to the Defendants. In connection with the Trustee's negative capital account(s) assertions, the Trustee must prove that Debtor's payments to the Defendants on account of the Guaranty reduced his own alleged negative capital account balance in WI. To confer a benefit on an insider, the alleged preferential payment

must do more than convey a mere potential or possible benefit. *In re Cannon Ball Ind., Inc.,* 155 B.R. 177, 180 (N.D.Ill.1993).

In the typical "trilateral" preference situation, the debtor is the primary or principal obligor. The Debtor then makes payments to a non-insider creditor, at the direction of, or under the control of, an insider guarantor of the obligation owing to the non-insider creditor. The insider's liability is contingent, not primary, and the debtor's payments reduce the insider's contingent liability.

However, in the case at bar, both the Debtor and the alleged insider are principal obligors. Debtor made payments to a non-insider creditor, but such payments were on the account of his own liability. Debtor was not directed, controlled, or influenced by the alleged insider, WI. In this case, the alleged insider's liability is direct, not contingent, and the alleged debtor/creditor relationship based on a negative capital account is simply not the same debt as to which Debtor made payments.

This case is not the same situation wherein the insider influenced the debtor to pay its obligation(s) over those owed to others, and where it exercised its ability to delay the bankruptcy filing until the preference period passed. *See, e.g., In re Skywalker,* 155 B.R. 526, 529 (9th Cir. BAP 1993). Nor, for that matter, can it be said in this case that, "... but for the insider guarantee, it is certainly doubtful that the outside lender would have received payment over other lenders." *Id.* at 530.

In the absence of insider control or influence, the rationale and the policy behind the avoidance of "trilateral" preferential transfers disappears. Nor, for that matter, do the policy arguments with respect to diminishing or depleting the estate compel the avoidance of the payments in this case because, according to the Trustee, each of the payments were part of the capital accounts which were eliminated by a transaction which the Trustee never attacked. The estate was never diminished or depleted under the Trustee's theory because it was a zero sum game.

In order to avoid and recover a "trilateral" preferential transfer, the Trustee must prove the existence of a debtor/creditor relationship between Debtor and WI. Creditor is defined broadly as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10) (1988). Proof of the debtor/creditor relationship is necessary under the *Deprizio* analysis in order to avoid the transfers in question. *Sufolla,* 2 F.3d at 983–984. The only "debt" which the Trustee has identified with any specificity in response to discovery, is the alleged negative capital accounts between Debtor and WI. The Trustee attempts to establish the "debt" by asserting the existence of Debtor's alleged negative capital account in WI and by pointing to the obligations of general partners to fund negative capital accounts as set forth in the WI Partnership Agreement.

A partner's capital account includes many different items, some of which are "non-cash" items. For example, a partner's capital account in a partnership will include capital contributions and withdrawals, operating profits and losses, depreciation, and amortization. In short, a partners' capital account is a means of keeping track of each partner's interest in the partnership from an accounting perspective; it simply does not constitute a "debt" owed to the partnership.

Most importantly, the fifth element of the *Deprizio* analysis requires that the transfer by the debtor enable the insider creditor to receive more than it would have received if the transfer had not been made and the debtor's estate was liquidated according to the provisions of Chapter 7 of the Bankruptcy Code. WI could not have received more than it would have received if the transfer(s) had not been made because WI received 100% of the "debt" in the October, 1990 "Tax Balancing Transaction" with WI and IAC. This transaction, which the Trustee never attempted to avoid, had the effect of eliminating the negative capital accounts in WI— the same capital account which the Trustee urges created the debtor/creditor relationship in the first instance. WI could not have received more via the transfers than it would have as a creditor of Debtor estate, because WI had been "paid" in full prior to the filing through a non-avoidable transaction; there-

fore, WI would not have been entitled to receive anything from Debtor's estate. Clearly, the transfers did not benefit WI nor deplete Debtor's estate.

### 3. *Debtor's Payments as Fraudulent Transfers*

 The Trustee alleged that it could recover Debtor's payments from the Defendants on fraudulent transfer theories based on the Bankruptcy Code and California Civil Code. However, the Trustee failed to address or support its allegations in its Motion for Summary Adjudication. Although the Trustee relies on § 548(a)(2) of the Bankruptcy Code, as well as California state law, to avoid and recover the payments in question as fraudulent transfers, the aforementioned authority all depend on the receipt by Debtor of less than reasonably equivalent value in exchange for the payments. This, the Trustee has not proven.

First, it is beyond dispute that Debtor was personally liable under the Guaranty. Therefore, Debtor's payments were made on the account of his own personal antecedent debt owed to the Defendants. Under the Bankruptcy Code, "value" includes the satisfaction of a present or antecedent debt in good faith. *See*, 11 U.S.C. § 550(b)(1). As to the reasonable equivalence of the payments, each of Debtor's payments resulted in a dollar-for-dollar reduction in Debtor's liability under the initial Guaranty.

California's fraudulent conveyance statutes are similar in form and substance to the Bankruptcy Codes' fraudulent transfer provisions, and the 9th Circuit has analyzed those statues and the Code Provisions contemporaneously. *In re United Energy Corp.,* 944 F.2d 589, 594 (9th Cir.1991). A proportionate reduction in rights or liability constitutes an exchange of reasonably equivalent value for fraudulent transfer purposes under the Bankruptcy Code or California state law. *United Energy Corp.,* 944 F.2d at 595. The Trustee has presented no evidence whatsoever to show a lack of reasonably equivalent value; therefore, under all the facts and circumstances of this case, the Trustee cannot avoid the payments as fraudulent transfers under the Bankruptcy Code or California Statutes.

### IV. *CONCLUSION*

This Court's review of applicable law compels the conclusion that, pursuant to 11 U.S.C. § 547(b), the Chapter 7 Trustee may not avoid and recover as preferential transfers the payments by the Debtor to the Defendants. Furthermore, pursuant to 11 U.S.C. §§ 548(a)(2) and 544 and California Civil Code §§ 3439.04(b) and 3439.07, the Trustee may not avoid and recover as fraudulent transfers the payments by the Debtor to the Defendants.

This memorandum of decision contains this Court's findings of fact and conclusions of law. Counsel for the Defendants shall lodge and serve a proposed order consistent with this memorandum of decision.