**In re FIRST ALLIANCE MORTGAGE COMPANY, et al., Related Debtors.**

**Michael and Barbara Austin, et al., Plaintiffs,**

v.

**Brian Chisick, et al., Defendants.**

**Official Joint Borrowers Committee, Plaintiff,**

v.

**Lehman Commercial Paper, Inc., et al., Defendants.**

**Nos. SA CV 01–971 DOC, SA CV 01–1111 DOC.**

United States District Court, C.D. California.

July 30, 2003.

---

Ronald Rus, Joel S. Miliband, Leo J. Presiado, Rus, Miliband & Smith, Irvine, CA, Robert W. Fischer, Jr., Helen L. Duncan, Joseph H. Park, Fulbright & Jaworski, Daniel M. Whitley, Dinh Ha, Los Angeles, CA, for respondent.

David B. Zlotnick, David B. Zlotnick Law Offices, San Diego, CA, Sheila Cana-

van, Sheila Canavan Law Offices, Berkeley, CA, Susan Schneider Thomas, Berger & Montague, Philadelphia, PA, Jonathan E. Behar, Milberg, Weiss, Bershad, Hynes & Lerach, Larry W. Gabriel, Mona S. Amer, Pachulski, Stang, Ziehl, Young & Jones, Los Angeles, CA, Thomas A. Jenkins, Daniel J. Mulligan, Jenkins & Mulligan, San Francisco, CA, David W. Meadows, David W. Meadows Law Offices, Beverly Hills, CA, David M. Paris, Alan Genitempo, Piro, Zinna, Cifelli & Paris, Nutley, NJ, Michael J. Muller, Michael J. Muller Law Offices, Hackensack, NJ, John W. Barrett, Barrett Law Offices, Lexington, MS, Sidney A. Backstrom, Richard F. Scruggs, Scruggs Law Firm, Pascagoula, MS, Joseph C. Langston, Langston Law Firm, Booneville, MS, Richard M. Heimann, Steven E. Fineman, Daniel E. Barenbaum, Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA, Hector Daniel Geribon, Lieff, Cabraser, Heimann & Bernstein, New York City, for movant.

## FINDING OF FACTS AND CONCLUSIONS OF LAW

CARTER, District Judge.

This civil bankruptcy case was tried before the Court, Honorable David O. Carter, United States District Judge, presiding, commencing February 13, 2003 and ending May 22, 2003. The Court having heard all the testimony and considered all admissible evidence, as well as the arguments of counsel and their respective proposed Findings of Fact and Conclusions of Law, hereby enters its Findings of Fact and Conclusions of Law in this case in conformity with Federal Rule of Civil Procedure 52. Any Finding of Fact that constitutes a Conclusion of Law shall be deemed a Conclusion of Law and any Conclusion of Law that constitutes a Finding of Fact shall be deemed a Finding of Fact.

## FINDINGS OF FACT

### I. PARTIES

1. Lehman Brothers Inc. is an investment bank that provides investment banking services to its clients, including mortgage lenders seeking to securitize mortgages through mortgage backed securities.

2. Lehman Commercial Paper, Inc. is a financial institution that provides financial services to its clients, including mortgage lenders. One of the services it provides to mortgage lenders is a secured warehouse line of credit.

3. On June 9, 2000, the Borrowers Committee was appointed by the United States Trustee pursuant to an order of the Bankruptcy Court, in accordance with Section 1102(a)(1) of the Bankruptcy Code. On or about September 10, 2002, this Court entered an "Order Confirming Debtors' First Amended Joint and Consolidated Plan of Liquidation Dated May 6, 2002 and Granting Debtors' Motion for Substantive Consolidation." Article V.E. of the Plan states that "[a]ll of the unliquidated assets of the Debtors' Estates," include the Borrowers Committee's claims against Lehman Commercial Paper Inc. and Lehman Brothers, Inc. (collectively, Lehman), in this adversary proceeding. The Plan provides that after the Plan becomes effective, "the affairs of the Liquidating Trust and all assets held or controlled by the Liquidating Trust shall be managed under the direction of the Liquidating Trust Trustee in accordance with the Liquidating Trust Agreement."

4. The Committee has asserted claims for equitable subordination and fraudulent transfer against Lehman.

5. Kenneth Henry is the Liquidating Trustee (Trustee) of the estates of First Alliance Mortgage Company (First Alliance) and related debtors in the bankruptcy cases jointly administered under Case No. SA 00–12370. The Trustee is the successor in interest to the Committee and the Committee's claims against Lehman.[1]

## II. FIRST ALLIANCE

6. First Alliance was started in 1971 by Brian Chisick. First Alliance originated, purchased, sold and serviced residential mortgage loans in the sub-prime lending sector through a network of retail branches located in various states throughout the nation.

7. As of December 31, 1998, First Alliance had net assets of more than $74.5 million. As of December 31, 1999, First Alliance had net assets of more than $79 million.

8. The sub-prime lending sector is comprised of borrowers are borrowers with blemished or tarnished credit histories, including bankruptcies and foreclosures.

9. First Alliance utilized a proprietary marketing methodology designed to identify individuals who, based on the Company's historic customer profiles, displayed a statistical likelihood for becoming a consumer of the Company's products and services and, at the same time, satisfy the Company's underwriting guidelines.

10. First Alliance's marketing methodology was designed to find individuals who had lived in their homes for a substantial number of years and who had built up substantial equity over the years.

11. First Alliance then focused its telemarketing and mailing efforts on these identified homeowners. The telemarketing representative's responsibilities were to describe the benefits of First Alliance's products and services, and obtain information about the homeowner and their property. Assuming the consumer agreed to further discuss a loan, the telemarketer arranged for an appraisal of the consumer's property by an "in-house" appraiser that visited the borrower at his or her property.

12. First Alliance's in-house appraisers were trained by First Alliance and were required to follow a script and manual.

13. The in-house appraisers were rated and compensated based in part on the number of sales appointments set.

14. First Alliance's appraisal formula was generally more conservative than other comparable lenders, as it was based on three houses in a three-block radius

15. First Alliance had a elaborate and detailed sales process and sales program developed by Brian Chisick, First Alliance's founder. The training program materials were modified from time to time by First Alliance vice president Patricia Sullivan with input from Brian Chisick and Jeffrey Smith. Both Smith and Sullivan reported to Brian Chisick. Chisick was always head of First Alliance's sales division.

16. Patricia Sullivan, who was in charge of training sales personnel, joined First Alliance in 1991. Jeffrey Smith worked for First Alliance since the early

---

**1.** Class Plaintiffs Michael and Barbara Austin, and George and Josephine Jerolemon have also brought an Amended Complaint for Equitable Subordination and Other Relief. The Class Plaintiffs have adopted the Trustee's arguments, and the equitable subordination claims are for all practical purposes identical. These Findings of Fact and Conclusions of Law therefore pertain to the equitable subordination claim of the Trustee, as well as the Class Plaintiffs' claim.

1980s and was the Executive Vice President in charge of sales and marketing. He also served as a member of the Board of Directors. First Alliance's senior sales staff as Todd Feldman (V.P. Sales California), Sal Bastswy (V.P. Sales, Midwest), and Vasilli Raptis (V.P. Sales, Eastern).

17. First Alliance's scripted sales program was known as the Loan Officer Track Manual (Track), and specific steps that loan officers were required to memorize and follow. The Track presentation consisted of 13 steps until April 1999 when it was changed to 12 steps.

18. Loan officer trainees were required to memorize the Track and to role-play with other loan officer trainees. They were videotaped and were given specific instructions on how to make the Track presentation. Once through the training program, loan officers moved to their respective branches. Often, they worked temporarily in an office with an experienced branch manager and successful loan officer as further training.

19. The loan officer explained to the consumer the supposed difference between interest rate, annual percentage rate (APR) and yield. The consumer was told that interest rate is what consumers care about, APR is what the federal government cares about and yield is what the banks care about in evaluating a loan.

20. The loan officer drew a box comparing the interest rate, APR, and yield. The loan officer then created two loans to compare. The loan officer showed the consumer that the interest rate on the two loans was exactly the same, but one loan was for a term of 15 years while the other was for 30 years. The loan officer then pointed out to the consumer that, while the APR was lower in the 30 year loan, the amount of interest the consumer would pay was a lot higher.

21. First Alliance's statement about the APR is correct in that the APR will increase as the loan term is shortened by extra principal payments. However, the reason the APR increases in this circumstance is that the loan origination fee and other loan fees, comprise a greater percentage of the "finance charge" while the "amount financed" is constant, and thus the finance charge rises as a percentage of the amount financed. The amount of the APR increase is considerably less with a lower loan origination fee and a shorter term loan. But with the huge First Alliance fees implicit in the example, the APR increase was dramatic. First Alliance intentionally did not disclose this information. This presentation led consumers to discredit the APR when it was later disclosed on the federally required Truth in Lending Statement.

22. First Alliance's loan presentation was designed to obfuscate the loan origination fee, and other fees and prepaid interest and true principal sum of the loan from the consumer borrower.

23. The manner in which First Alliance, through its loan officers, used the "amount financed" disclosure to confuse and mislead the borrower about the amount of the loan they were agreeing to was also deceptive. The "amount financed" is a term used and defined by Truth in Lending Act and Regulation Z as the gross amount of the loan minus the points and most of the other fees. The loan officer directed the consumer's attention to the "amount financed" box, and the Track instructed the loan officer to point to the box and say "this is the amount being financed." The amount financed was directly in line with the amount the consumers believed they were borrowing.

24. First Alliance's loan officers were taught to present the state and federal disclosure documents in a manner that was

both confusing and misleading. The presentation was so well preformed that borrowers had no idea they were being charged points and other fees and costs averaging 11 percent above the amount they thought they had agreed to borrow. This amount did not include the undisclosed loan origination fees, other miscellaneous fees, or prepaid interest charged to the borrowers.

25. First Alliance's loan officers misrepresented the loan origination fees as "minimum interest" or "the minimum amount that First Alliance needed to make on a loan," or the minimum finance charge. Any discussion of the loan origination fee always included a reference to the total finance charge.

## III. FIRST ALLIANCE'S LITIGATION AND BANKRUPTCY

26. Although a certain amount of litigation brought by borrowers against subprime lenders is common in the industry, the amount of borrower litigation against First Alliance began to increase substantially in late–1996.

27. On August 2, 1996, a lawsuit was filed by Mary Ryan, individually and as private attorney general, against First Alliance alleging misleading lending practices, elder abuse and unfair business practices. *Mary Ryan v. First Alliance Mortgage Company, et al.*, No. CV759815.

28. On September 10, 1996, a lawsuit was filed by Lucretia Wilder against First Alliance, individually and as private attorney general, alleging misleading lending practices and elder abuse. *Lucretia Wilder v. First Alliance Mortgage Company, et al.*, No. CV760638.

29. On May 2, 1997, a lawsuit was filed by Velda Durney, individually and as private attorney general, against First Alliance. The complaint alleged unfair and deceptive practices directed toward an elder, and unlawful business practices and false advertising in violation of Bus. & Professions Code § 17200, et seq. & § 17500, et seq. *Velda L. Durney v. First Alliance Mortgage Company, et al.*, No. CV765935.

30. In 1997, Carol and Henry Hong, individually and as private attorneys general, filed a lawsuit against First Alliance for misleading lending practices and unfair business practices. *Henry M. Hong, Carol J. Hong v. First Alliance Mortgage Company, et al.*, No. 784938–3.

31. On or about September 23, 1998, First Alliance, and companies affiliated with First Alliance or companies who had with business relationships with First Alliance—Nationscapital, Coast Security Mortgage and Riverview Escrow—received a letter from the Civil Rights Division of the Department of Justice informing the companies that the United States Department of Justice and the Attorneys General of Arizona, Florida, Illinois, Massachusetts, Minnesota, New York and Washington had initiated a joint investigation into the lending practices of the named corporations.

32. On October 30, 1998, the Attorney General of Massachusetts filed an action on behalf of the Commonwealth against First Alliance in the Superior Court of Massachusetts, in the County of Suffolk, seeking an injunction against First Alliance from charging rates, points and other terms which significantly deviated from industry-wide standards or which were otherwise unconscionable or unlawful.

33. On December 1, 1998, a lawsuit was filed by the Attorney General of the State of Illinois against First Alliance in the Cook County Circuit Court. The suit alleged violations of the Illinois Consumer Fraud Act, Deceptive Trade Practices Act and Illinois Interest Act.

34. On December 3, 1998, a lawsuit was filed by AARP against First Alliance and Brian and Sarah Chisick for unfair business practices and elder abuse pursuant to California Bus. & Professions Code § 17200, *et seq.*

35. On December 4, 1998, a class action was filed in New Jersey Federal District Court against First Alliance, alleging violations of New Jersey consumer protection laws, the Truth In Lending Act, and related federal regulations (*Bowser v. First Alliance*).

36. On February 5, 1999, the California Court of Appeal for the Sixth Appellate District issued its opinion in *Pagter v. First Alliance Mortgage* affirming the lower court's order denying First Alliance's petition to compel arbitration.

37. On March 10, 1999, a Minnesota District Court judge entered an order in the case of *State of Minnesota v. First Alliance Mortgage Company et al.* that permanently enjoined First Alliance from offering discount adjustable rate mortgage loans, or from providing consumer borrowers an additional notice entitled, "Important Notice of Loan Fees Charged by First Alliance Mortgage Companies." The order compels First Alliance to present the notice to borrower consumers prior to presenting them with any other disclosure document.

38. On or about April 23, 1999, the Court of Appeal of the State of California, Sixth Appellate District issued its decision in *Durney v. First Alliance Mortgage Company, et al.* The decision affirmed the trial court's determination that First Alliance's arbitration agreement was not enforceable and that it had been entered into based upon the fraudulent practices of First Alliance's loan officers.

39. On May 12, 1999 AARP filed an amended complaint against First Alliance and Brian Chisick for unfair, unlawful, fraudulent and deceptive business practices.

40. On or about September 21, 1999, the state of Minnesota reached agreement with First Alliance, agreeing to refund to Minnesota borrowers approximately $500,-000—an amount reached by providing $4,000 to each of the approximately 100 Minnesota borrowers, without exception, and another $2,000 in closing costs to each borrower who chose to refinance their loan with First Alliance. In addition, First Alliance was prohibited from offering "teaser rates" on its Adjustable Rate Mortgages.

42. In January, 2000, Jerry Hager, First Alliance's General Counsel, estimated that First Alliance's exposure in the pending litigation was between $2.5 and $3.1 million.

43. In March 2000, the *New York Times* published an article highly critical of First Alliance's loan origination procedures. The article also implicated Wall Street investment banking firms, and specifically concentrated on Lehman's role in funding First Alliance. A few days later, the ABC News program "20/20" aired a segment containing similar material.

44. Shortly thereafter, on March 23, 2000, First Alliance filed for protection under Chapter 11 of the Bankruptcy Code.

## IV. LEHMAN'S RELATIONSHIP WITH FIRST ALLIANCE

45. Lehman's initial business contacts with First Alliance began in 1995 when Kurt Locher joined Lehman as a Managing Director.

46. In June 1995, First Alliance's head of secondary marketing, Cassandra Fraulino sent to Lehman a confidential due diligence information memorandum. The memorandum sets out in detail First Alli-

ance's business operations and financial information.

47. In or around July 1995, one of Lehman's vice presidents, Errington Hibbert, was asked to perform corporate level due diligence on First Alliance's business practices. This process involved looking at whether the First Alliance's corporate structure and business operations provided a sound basis upon which Lehman could provide financial services to the company.

48. In July 1995, Hibbert, together with Stan Labanowski, an employee in Lehman's asset backed securitization group, traveled to California to conduct due diligence on First Alliance's business practices.

49. Hibbert's visit to First Alliance was his first to a sub-prime lender. Prior to his visit, Hibbert had been involved primarily in the conventional "A-paper" market, which at the time involved mostly well-recognized banks and institutions who lent to "prime" borrowers with exceptional credit.

50. Hibbert's common practice, unlike other Lehman employees, was to record in rough memo form his impressions of any company on which he was conducting due diligence. Upon the conclusion of his visit, Hibbert wrote a report expressing his impressions of First Alliance's business practices.

51. The post-visit report written by Hibbert was candid, discussing what he viewed as the strengths of First Alliance—the targeting, marketing and solicitation of potential borrowers with high equity, the ability to close the loan once the potential borrower was at the closing table, the conformity of the borrowers with First Alliance's underwriting guidelines, the almost non-existent possibility of default, and the aggressive collection practice—as well as the company's weaknesses—the high pressure nature of loan sales to persons who needed to cash-out equity, the number of loans made to senior citizens, the legal problems caused by aggressive collection tactics, and the practice of making loans based solely on collateral instead of the income of the borrower. Hibbert concluded that if any firm in the sector could be subject to governmental intervention, First Alliance would be the foremost candidate.

52. On July 26, 1995, David Bartlett of Lehman wrote a memorandum recommending the approval of a $100,000,000 loan facility for First Alliance. Lehman's Investment Banking Mortgage Securities Commitment Committee considered the facility and ultimately approved it. That loan facility, however, was refused by First Alliance and never put in place.

53. As part of its due diligence Lehman instructed its research department to conduct Internet searches for information on First Alliance and individuals with whom it was doing business. Among the information that research turned up was a July 23, 1995 article from the Seattle Times indicating that the State of Washington was investigating consumer complaints of non-disclosure by First Alliance's sales representatives.

54. On or about July 28, 1995, a telephone conversation took place between Lehman officers Robert Batt, Kurt Locher and Eric Hibbert, and Cassandra Fraulino, Batt wrote a memorandum of the conversation that included a discussion of a class action settlement in California, and the investigation by the State of Washington described in the Seattle Times article.

55. In September 1996, Lehman extended First Alliance a warehouse line of credit of up to $25 million as a back-up line to First Alliance's primary line with Prudential Securities (Prudential). The back-up line was used sporadically. After initial use, the line was not drawn on between

January and June 1997, and $15 million was drawn on during the July—September 1997 period During the last quarter of 1997 and all of 1998, First Alliance did not draw on the line of credit

56. From late–1996 to late–1997, Lehman co-managed four of First Alliance's public equity asset-backed securitization transactions (1996–4, 1997–1, 1997–2 and 1997–3), serving as the back-up manager to Prudential, who served as the lead manager.

57. In September 1998, First Union, who also provided a back-up warehouse line of credit, advised First Alliance that it was terminating its back-up warehouse facility effective October 30, 1998. Lehman was aware of this termination as Nebot had called Lehman's Francis Gilhool to determine whether Lehman would be interested in establishing a warehouse facility to replace First Union. Gilhool's response was positive and Nebot sent Gilhool certain financial information of First Alliance to get the process started.

58. In or around this mid-December 1998 time period, Lehman continued its due diligence of First Alliance's operations. Among other things, Lehman had its research department conduct a computer search of all articles relating to First Alliance Mortgage and all litigation that First Alliance may be involved with. Lehman instructed its library department to do a background search on First Alliance's principal officers. The results of this search included numerous news stories discussing litigation against First Alliance brought by both borrowers and state regulators.

59. In December 1998, First Alliance provided Lehman with a list of the litigation pending against it. That list set forth the state regulatory actions that were mentioned in the various news articles, and divided the pending litigation into two groups: (1) significant litigations, and (2) litigation in the ordinary course of business. The list included all the litigation then pending against First Alliance.

60. In or around December 15, 1998, Francisco Nebot provided Lehman's Robert Batt, a Lehman Senior Vice President, with various corporate due diligence documents and information, including organizational charts, biographies of Chisick, Nebot, and Smith, a breakdown of revenues, a residual interests valuation, a quarterly trends report, loan losses by pool, a draft of 1999 projections, a list of branches and their locations, production "waterfall", management letter, and the Interim Warehouse and Security Agreement between First Alliance and Prudential with extensions and amendments.

61. On December 16, 1998, before Lehman extended the $150 million warehouse line of credit to First Alliance, Wendy Rianda, First Alliance's General Counsel, sent to Lehman copies of the complaints in the actions that had been filed by the State Attorneys General from the states of Illinois, Minnesota and Massachusetts, among other pleadings. Rianda also sent Lehman the complaints in the Durney, Hong, Pagter, Ryan, Wilder, and Rasachack actions.

62. Lehman's in-house counsel, Richard Yates reviewed the complaints received from First Alliance. Yates was also provided with the various orders that were entered in the several of the cases pending against First Alliance. At the center of nearly all these complaints was the sales interaction between First Alliance's loan officers and its borrowers.

63. On December 23, 1998, First Alliance faxed Lehman a schedule of litigation disclosing three state actions, 18 defensive actions for consumer fraud, and the Department of Justice investigation.

64. On or about December 23, 1998, Prudential unexpectedly informed Brian Chisick and First Alliance Chief Financial Officer Francisco Nebot that it would not renew its warehouse facility with First Alliance. The agreement expired on December 31, 1998. Prudential cited three main reasons for the termination of its relationship with First Alliance: (1) Because of Prudential's over-exposure in the asset-backed sector, it was essentially down-sizing its investment in that sector; (2) Prudential was displeased with its negotiated deal with First Alliance and felt it could obtain a higher interest rate with other lenders; and (3) the "Litigation Issue."

65. As soon as First Alliance became aware of Prudential's refusal to renew its warehouse line, Nebot tried finding alternative financing sources.

66. If no new warehouse line could be put in place by December 31, 1998, First Alliance was unlikely to obtain a "going concern" opinion from its auditors.

67. Without a warehouse line and a "going concern" opinion, First Alliance would most likely have either been out of business or would have had to so substantially change its business operations that it could no longer directly fund consumer loans, which would have forced a substantial reduction in First Alliance's loan production.

68. On December 30, 1998, Lehman and First Alliance entered into a Master Repurchase Agreement (MRA) whereby Lehman agreed to provide First Alliance with a committed $150 million warehouse line of credit secured by First Alliance mortgages.

69. During 1999 and 2000, Lehman made secured loans to First Alliance pursuant to the terms of the MRA by advancing 95% of the value of mortgages First Alliance pledged as collateral (promissory notes and other documentation reflecting its interest in the mortgages). Draw downs on the credit line would be permitted for up to 95% of the face value of mortgage loans pledged to Lehman as collateral. The mortgage loans secured Lehman's advances to First Alliance. Thus, for every $100 worth of mortgages pledged by First Alliance, Lehman lent First Alliance $95.

70. Upon First Alliance's repayment of the amounts borrowed under the MRA, Lehman released the mortgage collateral to First Alliance, free of Lehman's liens on the mortgages.

71. Under the terms of the MRA, First Alliance was required to maintain a minimum shareholder's equity of $65.6 million and an Adjusted Tangible Net Worth of $32.5 million and First Alliance was not permitted to exceed a Total Leverage Ratio of 5.00.

72. First Alliance was required to provide quarterly and annual financial statements as well as officer's certificates certifying that First Alliance was in compliance with the terms, conditions, and requirements of the MRA during the relevant period.

73. The warehouse line closed on December 30, 1998. The following day, First Alliance drew $17,537,706.31 from the Lehman warehouse line.

74. In exchange for providing the warehouse line, First Alliance agreed to pay Lehman a commitment fee of $2.2 million, pay interest on any amounts outstanding under the financing, and pay a fee on the remainder of the financing line that was not being used. Lehman also obtained First Alliance stock warrants, representing 1% of First Alliance's outstanding common stock. The stock warrants were never exercised.

75. The warehouse agreement also provided that continued funding was contingent upon Lehman's satisfactory completion of its due diligence investigation of First Alliance within 45 days of the agreement (later extended to 60 days).

76. On January 11, 1999, a lawyer from Skadden Arps wrote a memorandum to Nebot and Rianda, forwarding "our due diligence request list." Included therein was a request for "all information re government proceedings." First Alliance forwarded the requested information the next day.

77. On January 12, 1999, First Alliance provided Fred Madonna of Lehman with additional due diligence materials, including Underwriting Guidelines, First Alliance's Appraiser's Manual, its Guide to Income Stips, and Quality Control Procedures Manual.

78. Also on January 12, 1999, First Alliance provided Madonna with a document confirming the terms of the warehouse line and asked Madonna to forward the document to Deloitte and Touche in order for them to issue their going concern opinion.

79. On January 14, 1999, a meeting was held between Lehman and First Alliance representatives reviewing all aspects of First Alliance's business operations, including the history of First Alliance, its origination processes, underwriting, servicing, quality control and systems, and prior securitizations of First Alliance loans. In addition, a significant amount of time was spent discussing First Alliance's litigation. In attendance at the meeting were most of the members of the Lehman "deal team" working on the First Alliance relationship, including Errington Hibbert, Martin Harding, Frank Gilhool, Fred Madonna, Mike McCully, Richard Yates, Jeffrey Fritzinger, and Mushfiqur Rahman.

80. As part of the information given to Lehman at this meeting was a document entitled "Pending Litigation." In this document First Alliance listed the case names of First Alliance's significant litigation matters, gave a summary of each case and set forth the current status of each of the litigation matters.

81. In the first part of 1999, Errington Hibbert was asked by Lehman Senior Vice President Frank Gilhool, a co-manager of Lehman's warehouse lending group, to once again assist in the corporate due diligence of First Alliance's business practices.

82. In February 1999, Hibbert prepared a written memorandum of his findings and conclusions. The memo noted that Prudential had been First Alliance's investment bank for over 7 years, and states that Prudential's refusal to renew the lending facility it had in place with First Alliance was due to "(1) over-exposure to the Asset Back sector meant less profitable clients would be weeded out; (2) historically Prudential felt they had been nickeled-and-dimed by [First Alliance] and (3) the Litigation issue."

83. As was the case in his 1995 due diligence memo describes aspects of First Alliance's business operations, loan origination procedures and general strengths and weaknesses of the company. Although the tone of the memo is more optimistic than the 1995 memo, Hibbert notes particular concern about First Alliance's litigation, and the increasingly powerful entities—such as the states and the AARP—lining up against the company.

84. On February 5, 1999, Lehman's Credit Risk Management issued a report requesting a $150,000,000 reverse repo facility for First Alliance, committed for one year. The report "recommended the extension of the $150 MM reverse repo facility (max. term 3 months) based on good

level of capitalization and the structure and terms of the facility itself."

85. Lehman's Commitment Committee met on February 11, 1999, to consider whether to go forward with the warehouse line and the securitizations with First Alliance. A report was submitted to the members of the committee the day before for their review. The report contained, among other relevant information, Hibbert's February 1, 1999 due diligence memo, to which Hibbert attached his 1995 due diligence memo, as well as a summary of all of First Alliance's litigation. In addition, the Commitment Committee report notes that "[a]ggregate fees to Lehman Brothers for this transaction are expected to be approximately $4.5 million." The Commitment Committee report recommended approval of Lehman's role as sole manager of First Alliance's asset-backed securities for 1999.

86. The Commitment Committee unanimously approved the extension of the warehouse line and securitizations with First Alliance at the February 11, 1999 meeting.

87. Quarterly, First Alliance sold the mortgages through securitizations and simultaneously repaid Lehman's loan with part of the securitization proceeds. When First Alliance repaid its Lehman loan, Lehman released its lien on the mortgages and First Alliance sold the mortgages to third-party investors. Thus, in return for its repayment of a $95 loan, First Alliance received from Lehman a $100 mortgage which First Alliance then sold to investors. As a result of this process, First Alliance converted a long term cash stream to its present value.

88. Each securitization involved approximately $100 million in loans as follows: (a) a first quarter securitization for 1999 completed on March 19, 1999 for $115 million; (b) a second quarter securitization

for 1999 completed on June 16, 1999 for $90 million; (c) a third quarter securitization for 1999, completed on September 17, 1999, for $117,440,000.; and (d) a fourth quarter securitization for 1999, completed on December 17, 1999 for $103,075,000. Lehman was the sole underwriter for all of the securitizations, receiving $2.2 million in fees.

89. From time to time during 1999 and 2000, Lehman retained the Clayton Group to conduct due diligence on loans generated by First Alliance. The Clayton Group is a company that specializes in analyzing loans for purposes of determining whether the loans and the documents supporting the loans comply with the lender's requirements and with state and federal laws and regulations pertaining to mortgage loans.

90. On or around October 1, 1999, Lehman extended First Alliance's warehouse line of credit for a one-year period to October, 2000.

91. On October 12, 1999, Lehman prepared a review of First Alliance's warehouse line. The report notes in pertinent part that "[t]he largest concern with this originator is the legal exposure that Lehman risks with First Alliance's business strategy which is high cost lending to this borrower base."

92. During the first quarter of 2000, First Alliance drew down approximately $77 million from the Lehman warehouse credit line, but First Alliance declared bankruptcy before repaying the amount drawn. Thus, as of First Alliance's bankruptcy filing, First Alliance owed approximately $77 million to Lehman. This amount was secured by mortgages First Alliance pledged to Lehman during the first quarter of 2000 as collateral for the loans.

93. Lehman filed a proof of claim against the First Alliance estate for the

approximately $77 million secured obligation owed to Lehman.

94. During the course of the bankruptcy Lehman was paid interest on the claim amount. Eventually, Lehman was fully paid on its claim. The amount paid to Lehman totaled $83,283,121.36 principal and interest.

### CONCLUSIONS OF LAW

### I. Fraudulent Conveyance

■ 1. A "fraudulent transfer" is a transfer of "some property interest with the object or effect of preventing creditors from reaching that interest to satisfy their claims" or "an act which has the effect of improperly placing assets beyond the reach of creditors." 5 Collier on Bankruptcy ¶ 548.04(1) at 548–4 (15th ed. Revised 2002); Witkin, 3 California Procedure (Enforcement of Judgment), 4th ed. § 445; *see also Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank*, 211 B.R. 704, 717 (S.D.Cal.1997), *aff'd in relevant part*, 166 F.3d 342 (9th Cir.1999); *Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency)*, 174 B.R. 557, 572, n. 37 (Bankr.N.D.Cal.1994).

2. The Trustee brings its fraudulent transfer claim under California Civil Code section 3439.04(a), which applies through bankruptcy code section 544(b)'s strong arm provision.

3. Section 3439.04(a) provides that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor ... if the debtor made the transfer or incurred the obligation ... with actual intent to hinder, delay, or defraud any creditor of the debtor." Cal. Civ.Code § 3439.04(a).

■ 4. Repayments of fully secured obligations—where a transfer results in a dollar for dollar reduction in the debtor's liability—do not hinder, delay or defraud creditors because the transfers do not put assets otherwise available in a bankruptcy distribution out of their reach, do not result in a diminution of the debtor's estate, and therefore cannot be fraudulent. *See Marshack v. Wells Fargo Bank (In re Walters)*, 163 B.R. 575, 581 (Bankr. C.D.Cal.1994); *Pioneer*, 211 B.R. at 712, 717–718; *Melamed v. Lake County National Bank*, 727 F.2d 1399, 1402 (6th Cir. 1984); *Bear, Stearns Securities Corp. v. Gredd*, 275 B.R. 190, 195 (S.D.N.Y.2002); *Pioneer*, 211 B.R. at 717–718.

5. Accordingly, fraudulent transfers can "essentially be defined as an act which has the effect of improperly placing assets beyond the reach of its creditors." 5 Collier on Bankruptcy ¶ 548.01, at 548–5 (15th ed. Revised 2002).

■ 6. Furthermore, a transfer made to persons who take in good faith and for reasonably equivalent value are not avoidable even when actually fraudulent. *See* Cal. Civ.Code § 3439.08.

■ 7. "A transferee lacks good faith if he or she (1) colludes with the debtor or otherwise actively participates in the debtor's fraudulent scheme, or (2) has *actual knowledge* of facts which would suggest to a reasonable person that the transfer was fraudulent." *CyberMedia, Inc. v. Symantec Corp.*, 19 F.Supp.2d 1070, 1075 (N.D.Cal.1998) (emphasis in original).

■ 8. As the mortgages First Alliance obtained from Lehman in return for repayment of First Alliance's secured loans from Lehman had a greater value than the amount borrowed, the transfers did not result in a diminution of First Alliance's assets available to First Alliance's creditors.

9. Accordingly, First Alliance did not intend to hinder, delay or defraud its creditors through repaying amounts borrowed from Lehman.

10. Lehman gave reasonably equivalent value to First Alliance in exchange for the transfers at issue.

11. Lehman did not collude or otherwise participate in a scheme to fraudulently transfer First Alliance assets; nor did Lehman have actual knowledge of facts which would suggest to a reasonable person that the transfers were fraudulent.

12. The transfers were not fraudulent and may not be avoided by the Trustee.

## II. Equitable Subordination

### A. Introduction

13. Pursuant to 11 U.S.C. section 510(c), a court may "(1) under principles of equitable subordination, subordinate for purposes of distribution all or a part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."[2]

■ 14. The power to subordinate a claim flows from the Bankruptcy Court's general equitable powers allowing it to adjust the equities between creditors in relation to the liquidation results. *See* 5

Collier on Bankruptcy ¶ 510.02[1], at 510–4 (15th ed. Revised 2002); *see also Bostian v. Schapiro (In re Kansas City Journal–Post Co.)*, 144 F.2d 791, 800 (8th Cir.1944) (court views claims "through the eyes of equity and dealing with them on the basis of equitable considerations to prevent injustice or unfairness in the bankruptcy situation").

■ 15. "This task by nature 're-quire[s] the court to make extremely subjective judgments as to whether a party has acted opportunistically.'" *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 349 (7th Cir.1997) (quoting David A. Skeel, Jr., "Markets, Courts, and the Brave New World of Bankruptcy Theory," 1993 Wis. L.Rev. 465, 506).

■ 16. A court may only equitably subordinate in reordering the priorities of bankruptcy claims—the doctrine does not permit disallowance of claims. *80 Nassau Associates v. Crossland Fed. Sav. Bank (In re 80 Nassau Associates)*, 169 B.R. 832, 837 (Bankr.S.D.N.Y.1994).

■ 17. Equitable subordination is a remedial, not a penal measure, and should be used only sparingly. *See United States Abatement Corp. v. Mobil Exploration & Producing, U.S., Inc. (In re United States*

---

**2.** Lehman argues that the Trustee's claim for equitable subordination is merely an attempt to recast its claim at law for aiding and abetting fraud. While the Trustee is allowed to plead alternative forms of relief under Federal Rule of Civil Procedure 8(a)(3), Lehman's argument is correct to the extent that once a party has obtained money damages, that same party may not also obtain equitable subordination based on the same conduct. *See Century Glove, Inc. v. Iselin (In re Century Glove, Inc.)*, 151 B.R. 327, 332 (Bankr.D.Del.1993) (citing *Bostian v. Schapiro (In re Kansas City Journal–Post Co.)*, 144 F.2d 791, 801 (8th Cir.1944)); *see also ABF Capital Mgmt. v. Kidder Peabody & Co., Inc. (In re Granite Partners, L.P.)*, 210 B.R. 508, 517 (Bankr. S.D.N.Y.1997) ("While a plaintiff cannot re-

cover damages and obtain equitable subordination for the same wrong, he may nevertheless *plead* both claims for relief").

The Trustee represents the creditor class as a whole, including the borrower class. Lehman's argument raises the issue of whether the Trustee is barred from obtaining equitable subordination based on the damages recovered against Lehman for aiding and abetting fraud after trial by jury by the same class of plaintiffs represented by the Trustee in this action. In addition, Lehman's argument raises the additional issue of whether the borrower class has been fully compensated for their injuries, thus barring their claim in the bankruptcy action. The Court's findings and conclusions on the merits, however, make it unnecessary to decide these issues.

*Abatement Corp.),* 39 F.3d 556, 561 (5th Cir.1994).

18. The three-pronged test for subordination of claims is set forth in *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 699–705 (5th Cir.1977), the seminal case on equitable subordination. These elements, which the plaintiff has the burden of showing, are: (1) "The claimant must have engaged in some type of inequitable conduct;" (2) "The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;" and (3) "Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *Id.* at 700.

19. Although equitable subordination is a seldom-applied remedy, there are generally three situations pursuant to which courts will apply the doctrine: when a fiduciary of the debtor misuses his position to the disadvantage of others; when a third party dominates or controls the debtor to the disadvantage of others; or when a third party defrauds other creditors. *Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust, (In re 604 Columbus Ave. Realty Trust),* 968 F.2d 1332, 1360 (1st Cir.1992).

### B. Inequitable Conduct

20. The level of inequitable conduct sufficient to trigger equitable subordination is not precisely defined. *In re 80 Nassau Associates,* 169 B.R. at 837.

21. The burden of proof on a plaintiff in proving inequitable conduct, as well as the degree of severity of the conduct, depends on whether the claimant is a fiduciary or an insider. *King Distributors, Inc. v. Liberty Sav. Bank (In re Toy King Distributors),* 256 B.R. 1, 196 (Bankr. M.D.Fla.2000). If the claimant is a non-fiduciary, non-insider, the burden of proof

and severity of conduct necessary to support a claim for equitable subordination is considerably higher, as courts are generally "reluctant to find the requisite level of misconduct in arms-length dealings between borrowers and lenders." *In re 604 Columbus Ave. Realty Trust,* 968 F.2d at 1361.

22. In the case of a non-fiduciary, non-insider, gross and egregious conduct, tantamount to fraud, misrepresentation, overreaching, spoilation or conduct involving moral turpitude are required before a court will equitably subordinate a claim. *See Bank of New Richmond v. Production Credit Ass'n of River Falls, Wisconsin (In re Osborne),* 42 B.R. 988, 996 (W.D.Wis.1984); *see also In re Toy King Distributors.,* 256 B.R. at 195–96 (non-insider, non-fiduciary creditor will not generally be subordinated absent egregious conduct is proven with particularity); *In re 80 Nassau Associates,* 169 B.R. at 838–39.

23. While courts commonly discuss the level of non-insider, non-fiduciary conduct sufficient to warrant equitable subordination, that standard is rarely if ever met. *See In re 604 Columbus Ave. Realty Trust,* 968 F.2d at 1362 ("For the most part, courts have been reluctant to find the requisite level of misconduct in arms-length transactions"); *In re 80 Nassau Associates,* 169 B.R. at 839 ("the cases that enunciate the 'gross and egregious' or similar standard uniformly fail to find conduct that meets the standard, and deny equitable subordination").

### C. Aiding and Abetting Fraud

24. The alleged inequitable conduct that serves as the basis for the Trustee's claim is Lehman's aiding and abetting of fraud perpetrated by First Alliance on its borrowers.

25. Aiding and abetting liability may be imposed in situations where the alleged aider and abettor (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person. *Saunders v. Superior Court,* 27 Cal.App.4th 832, 33 Cal.Rptr.2d 438, 446 (1994)

26. California law is consistent with Section 876(b) of the Restatement of Torts, which states: "[f]or harm resulting to a third person from the tortious conduct of another, a person is liable if he ... (b) knows that the other's conduct constitutes a breach of a duty and gives substantial assistance or encouragement to the other so to conduct himself." Rest. Torts 2d, § 876(b).

27. The sales presentation and methods by which First Alliance's loan officers convinced borrowers to enter into loans containing hidden egregious loan origination fees (points), other "junk" fees, and prepaid interest constitute a fraud perpetrated by First Alliance. The key to this fraud was the loan officers pointing to the "amount financed" in representing it as the "loan amount." At the time the sales representations made this statements to the borrowers they knew the statements to be false and intended that the borrowers to rely on those statements in entering into the loan transaction with First Alliance.

28. First Alliance borrowers justifiably relied on the representations of the loan officers in light of their experience and knowledge in entering into the loan transaction.

29. The borrowers were damaged by the fraudulent conduct of First Alliance in that they either would have obtained a loan with considerably fewer points and fees from another lender, or they would have chosen not to complete the transaction.

30. Lehman knew that First Alliance was engaged in fraudulent practices designed to induce consumers to obtain loans from First Alliance: (1) at the time they funded the warehouse loan on December 30, 1998; (2) after they extended the warehouse loan; and (3) during 1999 and early 2000.

31. Lehman satisfied all of First Alliance's financing needs. Lehman's financing constituted significant, active and knowing participation by Lehman in the First Alliance fraud, thereby substantially assisting First Alliance in its fraudulent lending practices.

**D. Subordination of a Non–Insider, Non–Fiduciary Claim**

32. While Lehman's conduct in aiding and abetting the First Alliance lending fraud is inequitable in a general sense, the question before the Court is whether such conduct was sufficiently egregious to justify equitable subordination of a non-insider, non-fiduciary creditor.

33. Lehman's conduct did not deplete or otherwise adversely impact First Alliance's assets, nor was Lehman's conduct related to the acquisition or assertion of its secured claim against the First Alliance estate. *See Prudence Realization Corp. v. Geist,* 316 U.S. 89, 93, 62 S.Ct. 978, 981, 86 L.Ed. 1293 (1942) ("the equity powers of the bankruptcy court may be exerted to subordinate the claims of one claimant to those of others of the same class where his conduct in acquiring or asserting his claim is contrary to established equitable principles"); *Stebbins v. Crocker Citizens Nat'l Bank (In re Ahlswede),* 516 F.2d 784, 788

(9th Cir.1975) ("there must be conduct either in acquiring or asserting the claim which is itself inequitable in order to subordinate a claim"), *cert. denied* 423 U.S. 913, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975). *But see, e.g., Wilson v. Huffman (In re Missionary Baptist Found. of America)*, 818 F.2d 1135, 1143 (5th Cir.1987) ("inequitable conduct directed against the debtor or its creditors may be sufficient to warrant the subordination of the claim irrespective of whether the conduct was related to the acquisition or assertion of that claim"); *In re Kansas City Journal–Post Co.*, 144 F.2d at 803 ("The inequity ... need not therefore be specifically related to the creditor's claim ... but it may equally arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate"). Instead, the impact of Lehman's conduct on First Alliance borrower creditors is only tangentially related to the First Alliance bankruptcy in that both Lehman and the borrowers are creditors of the First Alliance estate.

35. There are very few cases in which courts have equitably subordinated the claims of non-insider, non-fiduciary creditors. Several of those cases involved misrepresentations by the claimant to another creditor. *See Miller v. Borton (In re Bowman Hardware & Elec. Co.)*, 67 F.2d 792, 795 (7th Cir.1933) (claimant who caused misstatement to be made to another creditor regarding the existence of the claimant's loan to the debtor was equitably subordinated to that creditor's claim); *In re Osborne*, 42 B.R. at 1000 (claimant's misrepresentation to another creditor, and justifiable reliance on that misrepresentation, supported subordination of claim to that of the injured creditor); *Sepco, Inc. v. Valley State Bank (In re Sepco)*, 36 B.R. 279, 287–88 (Bankr.D.S.D.1984) (claimant's

concealment of subordination agreement in document entitled "Offer for Sale" and misrepresentations that creditor would be assured payment was sufficient basis for subordination of claim). Other cases were based on the existence of a fraud perpetrated against a debtor that played a significant role in bringing about the debtor's bankruptcy. *See In re 604 Columbus Ave. Realty Trust*, 968 F.2d at 1362 (Bank's commission of fraud, breach of contract and conversion of loan proceeds for the payment of a kickback and soft costs warranted equitable subordination of claim); *Slefco v. First Nat, Bank of Stuttgart (In re Slefco)*, 107 B.R. 628, 644 (Bankr. E.D.Ark.1989) (Bank's misrepresentations concerning amounts it intended to loan the debtor resulted in the debtor "riding" its trade creditors and increasing the amount of its unsecured debt).

36. Lehman did not have any communications with the First Alliance borrowers, nor did it have any other type of relationship with the borrowers. Furthermore, Lehman's provision of financial services to First Alliance—i.e. providing a warehouse line of credit and securitization of mortgage loans—did not result in misappropriation of funds by First Alliance or otherwise exacerbate First Alliance's unsecured debt. Accordingly, cases where courts have subordinated the claims of non-insider, non-fiduciary claims to those of other creditors provide little guidance in the present case.

37. Lehman's activities were undertaken at arms-length, in the normal course of business, without any contemplation or recognition of the later-filed First Alliance bankruptcy. Similarly, Lehman's conduct was not a contributing factor to either bringing about the First Alliance bankruptcy, or determining the ordering of creditors to the bankruptcy estate. While the Court by no means condones Lehman's

**670**

activities, under the heightened and rarely-met standard for the subordination of non-insider, non-fiduciary claims, Lehman's conduct does not demonstrate "gross" or "egregious" misconduct that "shocks the conscience of the court." As such, the Trustee has failed to establish the first element required for the harsh remedy of equitable subordination of Lehman's secured claim by a preponderance of the evidence. It is therefore not necessary for the Court to consider the remaining *Mobile Steel* elements.

### CONCLUSION

The Court finds and concludes that First Alliance's transfers to Lehman were not fraudulent and are not avoidable. The Court furthermore finds and concludes that Lehman's conduct toward the borrowers does not warrant equitable subordination of Lehman's claim. The relief sought in the Trustee's claims is therefore DENIED.

IT IS SO ORDERED.